**UNITED STATES of America,
Appellee,**

v.

**Ellsworth William WHITE, Appellant.**

**Nos. 71–2219, 72–1705.**

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 30, 1972.

Decided Aug. 1, 1973.

Lowry J. Miller, Arlington, Va. (Court-appointed counsel), for appellant in Nos. 71–2219 and 72–1705.

Joseph A. Fisher, Asst. U. S. Atty. (Brian P. Gettings, U. S. Atty., Gilbert K. Davis, Asst. U. S. Atty., on brief), for appellee in Nos. 71–2219 and 72–1705.

Before HAYNSWORTH, Chief Judge, and CRAVEN and WIDENER, Circuit Judges.

HAYNSWORTH, Chief Judge:

Appealing from his conviction of bank robbery in violation of 18 U.S.C.A. § 2113(a), (d), White complains of the absence of a line-up preceding his trial, of a refusal of a motion to sever his trial from that of two co-defendants, and of the denial of a motion for a new trial, based upon after-discovered evidence. We affirm after careful consideration of his contentions.

At approximately 11:10 o'clock in the morning of July 20, 1971, the Alexandria National Bank, in Alexandria, Virginia, was entered by four black males. One was armed with a shotgun and another with a pistol. The manager of the bank testified that the man with the pistol ordered her and others to lie down on

the floor. Meanwhile, two of the other robbers proceeded to scoop up money from the drawers of the tellers and from the drive-in window. The four then left the bank and drove off in a blue Dodge, which had been stolen from Avis-Rent-A-Car at Washington National Airport. After driving a short distance, the Dodge was parked in the parking area of some apartment houses and the men went over, or through, a fence and entered a white Buick Wildcat, driven by a girl confederate who was waiting for them. The five then drove to the Bellview Naval Observatory, where they abandoned the Buick, a car which had been stolen that morning from a street in the District of Columbia, and all entered a blue Cadillac belonging to Paul Dixon, one of White's codefendants.

At the joint trial of White, Dixon and the girl, Lewis, the manager of the bank and two tellers all identified Dixon as one of the robbers; the manager and one of the tellers identified White as another. The second teller said that one of the robbers was tall and slender, as White is, but she was not certain that White was the man.

A maintenance man at the apartment houses, where the Dodge was abandoned, testified that he saw the girl, Lewis, and White there, but his testimony was shaken when it appeared that, earlier, he had identified a picture of Dixon as one of the men he had seen. While still on the witness stand, when shown a picture of a line-up which included Dixon, he picked Dixon out as the person he had just pointed to in the courtroom, who, of course, had been White.

A resident of the housing area of the Bellview Naval Observatory witnessed the second exchange of cars, and she identified Dixon and the girl, Lewis, as two of the people she saw.

At approximately 8:30 o'clock on the morning of the robbery, a traffic patrolman in the District of Columbia stopped an automobile which, from its license tag number, he recognized as being owned by a rental car company. Dixon was the driver of the car, and White was with him. The patrolman had stopped the car, because of a traffic signal violation, but he asked White and Dixon for identification. They could produce none, nor did they have any evidence of their right to possession of the vehicle. At that time both Dixon and White fled, but White was captured and carried to a police station, where he was questioned and, denying all knowledge that the vehicle was stolen, released at approximately 9:50 o'clock the same morning.

In the evening of that same day, Dixon was spotted in his blue Cadillac by agents who had received a description of it from the witness at the Observatory. They undertook to arrest Dixon. White was nearby. He rushed up, demanded to know what the charge was and declared that Dixon could have committed no robbery, for he had been with White all day. Thereafter White was arrested.

I

At White's arraignment, his lawyer made a motion that the court require that a line-up be held with White as a participant. The prosecuting attorney stated that the conduct of such a line-up would be agreeable with him, and it was apparently understood that such a line-up would be held within the next two weeks. Thereafter, two things happened. It was discovered that White had not attained his eighteenth birthday and the Attorney General had not consented to a prosecution of him as an adult. For that reason, the indictment was dismissed as to him. Meanwhile, he had been released on bail. Later, the Attorney General did consent to a proceeding against White as an adult and he was reindicted, but, apparently, he remained free on bail.

At the trial, counsel moved for the suppression of all identification evidence as to White, because he had not been placed in a line-up in accordance with the understanding reached at the time of the arraignment on the first in-

dictment. The trial judge thought that counsel for each side bore equal responsibility for failure to hold the line-up or to bring the matter to his attention. With this, we agree. After dismissal of the first indictment as to White and his release on bail, if White and his lawyers still wished his participation in a line-up, they should have contacted the District Attorney, or the judge, and not have sat quietly back with no attempt to pursue the matter. The district attorney's office may not have been without fault, too, but suppression of in-court identification testimony is not an appropriate remedy for the failure of compliance with a general understanding about a line-up, when the defendant and defense counsel bore, at least, an equal share of responsibility for it.

■ There is no authority to support a contention that a defendant has a legal right to a line-up, if he requests it. If he is in custody, the government may place him in a fair line-up. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L. Ed.2d 215 (1963). But the cases cannot be read as giving a defendant an enforceable right to such a line-up on penalty of prohibition of untainted identification testimony. Here, however, it seems plain that the prosecutor would have complied with the understanding, and the judge would have required him to do it, if defense counsel had pursued the matter.

■ There is some claim of taint in the in-court identification of White by the teller. A short time before the trial, the teller had picked out White as one of the robbers when shown a photographic spread, though neither she nor the manager had picked him out in an earlier photographic spread containing a different picture of White. The photographs were examined by the jury, and the jury was told that it should not consider the teller's identification of White, if it thought the photographs unduly suggestive. Apparently, it did not, and we find nothing unfair or improper in the use of the photographic spreads.

## II

■ We find no error in the denial of White's motion to sever his trial from that of Dixon and the girl, Lewis. There were no confessions with cross accusations, and neither defendant was trying to throw the mantle of guilt upon any other defendant. Dixon did not take the witness stand. White and Lewis did take the stand to present alibis. Lewis testified that she was at her home all that day, while White testified that he went from place to place in the District of Columbia. These circumstances make the rule of DeLuna v. United States, 5 Cir., 308 F.2d 140, inapplicable. See United States v. De La Cruz Bellinger, 9 Cir., 422 F.2d 723.

## III

■ The motion for a new trial, based upon after-discovered evidence, is founded upon statements obtained by the government, copies of which were supplied to defense counsel, in which five defendants, in an indictment for a conspiracy to rob banks, gave statements tending to exculpate White. The statements are in hopeless conflict, however, and were given, according to one, after they had discussed the matter in the bull pen in the Marshal's office and had agreed "to cut White loose, you know," in order that White might sue the United States.

Two of the statements had five black men entering the bank on July 20. Two others have only four entering the bank, but those two stoutly declared that Dixon was not present, though they had borrowed Dixon's car. Some had the band assembling at Dixon's house, while another had them assembling at a play ground. The manager was made to lie down on the floor by a man brandishing a butcher knife, though in White's trial no one saw a butcher knife, and the command to the manager and the others was given by a man holding a pistol. In

one of the statements, the man was asked about the get-away car; he said it was a Ford, not a Dodge. The time sequence is all wrong. Most of the statements place the robbery at shortly after 9:00 o'clock and one of the men claimed he had to wake Dixon up at 8:30 to get his car keys and borrow his car on July 20. We know, of course, that Dixon and White were stopped by the traffic patrolman about 8:30 on July 20 and that the bank was not robbed until after 11:00 o'clock.

There may be a reasonable explanation for the discrepancy. The same bank was robbed again by a group of black men in October. The robbery actually occurred shortly after 9:00 o'clock and the get-away car was a Ford. The robbers used the same general *modus operandi* as those who robbed the bank in July. They wore surgical gloves; one was armed with a shotgun and another with a pistol. The Ford get-away car had been stolen from a rental car company at the Washington National Airport. It was abandoned a short distance from the bank. Each of the men stoutly insisted that he was not involved in the October robbery, but participation in it would have given them general familiarity with the bank's interior arrangement and would clearly account for the earlier time sequence and reference to the Ford as the get-away car. Perhaps, it would explain other discrepancies in the statements, for the men were in disagreement as to where the money was divided, who stole the cars, and where and when. Two of the men could have been in the bank with Dixon and White in July.

Two of these men had been with Dixon and White in a youth detention center in Maryland. Others knew White. Indeed, one of them had testified before a grand jury that he had seen White and Dixon leave Dixon's home for the July 20 robbery. When it is recalled that all of the statements were given after the men had agreed "to cut White loose, you know," it may not be surprising that they are consistent only in their exculpa-

tion of White and that, otherwise, they are filled with inconsistencies and with some details which are consistent with the known facts of the October robbery, but inconsistent with the known facts of the July robbery.

One of the five giving postconviction statements was the Lewis girl. As the four men, she said that White was not one of the July robbers. At the time, however, she was "very high" on drugs. She knew only Cook and Bailey; she did not then know the names of the other two, "because like introductions wasn't around." Later, she said, she was told that the two unknown men were Dixon and Bland.

For such reasons, we conclude from these statements, that if these men and the girl were offered as witnesses on a retrial of White, their testimony would appear so contradictory and unreliable that they would not be believable. Denial of the motion for a new trial on that ground was well within the range of the District Court's discretion.

Affirmed.