Filed 5/31/12

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S173973 |
| v. | ) | |
| | ) | Ct.App. 4/1 D052091 |
| JOAQUIN MENA, | ) | |
| | ) | San Diego County |
| Defendant and Appellant. | ) | Super. Ct. No. SCD205930 |
| _____ | ) | |

When a trial court denies a defendant's motion for a physical lineup and the defendant does not seek writ review of that ruling, is the defendant barred from raising the issue on postjudgment appeal? The Court of Appeal said yes, reasoning that a failure to challenge the ruling by writ undermines the purpose of the lineup right conferred under *Evans v. Superior Court* (1974) 11 Cal.3d 617 (*Evans*) and prevents the reviewing court from fashioning relief if it finds error. Although writ review may be the more effective means of protecting a defendant's right to a lineup, we decline to impose a writ requirement as a prerequisite to raising the issue on appeal. The right to appeal after judgment is statutory. We have historically been hesitant to create procedural bars to the exercise of that right.

Alternatively, the Court of Appeal assumed the issue was preserved and that the trial court erred. The Court of Appeal properly concluded that any error was harmless. Accordingly, the judgment is affirmed.

In reaching this conclusion, we clarify the source of the due process right relied on by the *Evans* court to require a lineup in appropriate cases. The *Evans*

1

rule is based on state due process. Therefore error is reviewed under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*).

## I. FACTUAL AND PROCEDURAL BACKGROUND

Around 5:00 p.m. on April 13, 2007, 15-year-old Jesus C. and 17-year-old Jonathan F. were walking to Jonathan's home. As they crossed the street, a red Ford travelling toward them stopped in the intersection. A white car followed a few seconds later and also stopped in the intersection. The occupants of both cars were young Hispanic men with shaved heads or short hair. One of the men got out of the red car, approached the boys and yelled, "How's the East Side life treating you?" Jesus knew he was in an area claimed as "East Side" gang territory and believed the man was asking whether he was in a gang. Both boys answered that they did not "bang," meaning they were not in a gang. The man ran forward and swung his fist at Jesus, who backed up to dodge the blow.

The occupants of both cars got out and the boys ran. Some of the men from the red car chased them. Jesus could not recall how many ran after him, but believed it might have been two. As he ran, Jesus looked back "a couple of times." One man got within two feet and swung a knife at him. The man yelled, "Stop running or I'm going to shank you." Jesus kept running for half a block until he realized he was no longer being chased. He turned and saw the men running back to the cars. One of the men carried a black bat.

Jonathan testified that the men from the red car were within 12 to 14 feet of them when the boys started to run. The boys ran in different directions. Jonathan saw one man chasing Jesus. Three men chased Jonathan. One had a baseball bat and another held a knife. Jonathan was struck in the head with the baseball bat. Taken to the hospital, he received stitches for a wound above his ear.

Around 6:00 p.m., two investigating officers saw a red Ford parked about three blocks from the intersection where the boys had been approached. No evidence was presented at trial linking the car to the assault. The officers saw four Hispanic men, including defendant Joaquin Mena, sitting in the front yard of a

2

nearby house. When the officers approached, two of the men ran inside. Defendant and Jorge Lopez remained in the yard, sitting in chairs bearing East Side gang graffiti. The officers recovered a steak knife from defendant's pocket.

Inside the house, the officers found Adrian Pasillas hiding under the covers of a bed. Pasillas looked like he had been in a fight, with abrasions on his head and dried blood on his face and shirt. The officers found two bats in the side yard next to a can of black spray paint. Both bats had been recently painted.

Officer Martha Gasca met with Jesus and asked whether he would view a curbside showup. Jesus was nervous and somewhat afraid, telling Gasca that his neighbor had been killed recently after testifying in court. Jesus agreed to go with her but, while being driven to the showup, covered his face with the hood of his sweatshirt and lay down in the backseat. They arrived at the location of the showup around 7:00 p.m., when it was still light.

During the showup, Jesus remained in the back of the patrol car. One officer stated the car was parked about 35 feet from the suspects; another officer described the distance as 15 to 20 feet. The showup included defendant, Lopez, and Pasillas, along with Robert Ferguson, the other man who had run into the house, and Ricardo Sanchez, who was also found in the residence. Before the men were presented, Jesus was read an admonition that included an advisement that he was not obligated to identify anyone. Each suspect was then presented individually, and turned so that Jesus could see him from the front, side, and back. Jesus testified at trial that he pulled his hat down and crouched as low as possible behind the front seat of the police car during the showup. He did not tell Officer Gasca that he had any difficulty seeing the suspects, although he testified that the men were "far away." Jesus identified defendant, Lopez, Pasillas, and Sanchez. Referring to defendant Mena, Jesus said, "Yes." As to Lopez, he said, "Yes, he was there too." Jesus specifically identified Pasillas as the man with the knife. Jesus said that Sanchez was the last man to get out of the car. He said that during the incident he did not see Ferguson, who is White.

3

On May 9, 2007, the police met with Jonathan and showed him four photographic lineups, one for each of the men Jesus had identified. Jonathan identified only defendant's photograph, stating that it "looked like" one of the men in the red car, but he was not sure.

All four of the men identified at the showup were jointly charged. Before the preliminary hearing, codefendant Lopez sought an order directing the police to conduct a physical lineup for Jesus to attend. Defendant joined in the motion. Lopez argued there was a reasonable likelihood of misidentification based on Jesus's brief opportunity to see his assailants; his failure to provide any details as to "clothing, [t]attoos, jewelry, [or] piercings"; and his initial statement that he might "possibly" identify the men if he saw them again. Lopez argued that the curbside showup, in which Jesus was shown four Hispanic males of similar dress, hairstyles, and facial hair, was suggestive.[1] The trial court denied the motion, concluding there was no reasonable likelihood of misidentification that would be resolved by a physical lineup.

At both the preliminary hearing and trial, Jesus was unable to identify defendant or codefendants Pasillas and Lopez.[2] Likewise, Jonathan made no identifications in court. However, at trial Jesus testified that the four men he had identified at the showup were involved in the chase.

Defendant was convicted of two counts of assault with a deadly weapon and of carrying a concealed dirk or dagger.[3] The jury also concluded that defendant committed both assaults for the benefit of a criminal street gang.[4]

---

[1] No defendant challenged the curbside showup as being so impermissibly suggestive as to violate due process. (See *Manson v. Brathwaite* (1977) 432 U.S. 98, 104-107; *Neil v. Biggers* (1972) 409 U.S. 188, 196-199.)
[2] Sanchez pled guilty before trial.
[3] Penal Code section 245, subdivision (a)(1); *id*., section 12020, subdivision (a)(4). All further undesignated statutory references are to the Penal Code.
[4] Section 186.22, subdivision (b)(1).

Defendant was placed on probation for three years and sentenced to one year in the county jail.

Defendant contended on appeal that the trial court erroneously denied his motion for a pretrial lineup, and that the error was prejudicial under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman.*) The Court of Appeal concluded that defendant forfeited his right to appeal the denial of his lineup motion by failing to seek a pretrial writ. It observed: "When a trial court denies a request for a pretrial lineup, and the defendant elects not to challenge the ruling by writ, the delay effectively thwarts the purposes served by the right conferred under *Evans* and prevents a court reviewing the claim on appeal from the conviction from fashioning any appropriate relief even if it finds error." The Court of Appeal thus held: "Because of the uniquely ephemeral nature of the rights conferred by *Evans*, we conclude the requirement of timely pursuit of a lineup includes timely review of an adverse ruling by writ proceedings, and failure to pursue writ relief waives the claim of error."

Addressing the issue on the merits, the Court of Appeal held that even assuming defendant had preserved his claim and that the trial court had abused its discretion in failing to order a lineup, the error was harmless beyond a reasonable doubt because Jesus did not identify defendant at either the preliminary hearing or trial.[5]

## II. DISCUSSION

### A. Defendant's Right to a Lineup

This court established the procedure for seeking a so-called *Evans* lineup in 1974. In *Evans*, *supra*, 11 Cal.3d 617, witnesses had identified the defendant at the crime scene after seeing only the back of his head and shoulders through the

---

[5] The Court of Appeal assumed error and we do likewise. Because we have limited our review to issues of procedure, we express no further opinion whether the trial court's ruling was actually erroneous.

5

rear window of a police car where he was seated. The defendant asked the trial court to order police to conduct a pretrial lineup. The trial court was inclined to do so, but believed it lacked authority to make such an order. The defendant ultimately applied to this court for a writ of mandate.

When *Evans* was decided, there were no cases holding "as a matter of discovery in criminal matters that a trial court may order the granting of a defendant's request for a pretrial lineup." (*Evans*, *supra*, 11 Cal.3d at p. 621.) The *Evans* court held: "[D]ue process requires in an appropriate case that an accused, upon timely request therefor, be afforded a pretrial lineup in which witnesses to the alleged criminal conduct can participate." (*Id.* at p. 625.) The right to a lineup, however, is neither universal nor categorical. To secure a court-ordered lineup a defendant must show that eyewitness identification is a material issue and there is "a reasonable likelihood of a mistaken identification which a lineup would tend to resolve." (*Ibid.*)

The *Evans* court explained: "The questions whether eyewitness identification is a material issue and whether fundamental fairness requires a lineup in a particular case are inquiries which necessarily rest for determination within the broad discretion of the magistrate or trial judge. [Citations.] We do not hold, accordingly, that in every case where there has not been a pretrial lineup the accused may, on demand, compel the People to arrange for one. Rather, as in all due process determinations, the resolution here to be made is one which must be arrived at after consideration not only of the benefits to be derived by the accused and the reasonableness of his request but also after considering the burden to be imposed on the prosecution, the police, the court and the witnesses." (*Evans*, *supra*, 11 Cal.3d at p. 625.)

**B. Writ a Basis to Challenge Ruling Denying a Lineup Motion**

Here, the Court of Appeal held that a defendant is barred from challenging the denial of a lineup motion on appeal if the defendant failed to first seek interlocutory writ review of that ruling. We reject that judicially imposed

6

requirement. Instead, we hold that a defendant may, but is not required to, seek writ relief. A failure to do so has tactical consequences but forfeiture of appeal is not one of them.

" 'It is settled that the right of appeal is statutory and that a judgment or order is not appealable unless expressly made so by statute.' " (*People v. Mazurette* (2001) 24 Cal.4th 789, 792; see *People v. Totari* (2002) 28 Cal.4th 876, 881.) Section 1237, subdivision (a) confers on the defendant the right to appeal from "a final judgment of conviction." However, section 1259 makes clear that the full scope of appeal encompasses "any question of law involved in any ruling, order, instruction, or thing whatsoever said or done at the trial or prior to or after judgment, which thing was said or done after objection made in and considered by the lower court, and which affected the substantial rights of the defendant." (§ 1259.) "[T]he Legislature has provided for appellate review of judgments and postjudgment orders *and* any intermediate order or decision which involves the merits or necessarily affects that judgment or postjudgment order, or which substantially affects the rights of a party." (*In re Matthew C.* (1993) 6 Cal.4th 386, 396, fn. omitted.) Under section 1259 "an appellate court may review any question of law involved in any order made prior to judgment." (*People v. Chi Ko Wong* (1976) 18 Cal.3d 698, 710.) An order denying a lineup motion involves a question of law made before the judgment and it affects a substantial right of the defendant. Therefore, it falls within the scope of section 1259. If allowed to stand, the Court of Appeal's requirement could impose a significant limitation on that right.

This court reviewed the denial of lineup motions on postjudgment appeal in *People v. Abel* (2012) 53 Cal.4th 891, 911-913, and *People v. Redd* (2010) 48 Cal.4th 691, 723-725, in which the lineups were requested shortly before trial, and *People v. Farnam* (2002) 28 Cal.4th 107, 183-184, and *People v. Williams* (1997) 16 Cal.4th 153, 235-236, in which lineups were sought during the penalty phase of trial. In each case we concluded that the trial court did not abuse its discretion by

7

denying the lineup motion.  However, none of these cases raised the question of whether a failure to seek writ relief bars review on appeal.

A reviewing court may exercise its jurisdiction in either a direct appeal or an extraordinary writ proceeding.  (*Leone v. Medical Board* (2000) 22 Cal.4th 660, 668.)  A writ of mandate, or mandamus, is an extraordinary writ known at common law.  The writ of mandate lies generally to compel performance of a legal duty when no plain, speedy, and adequate remedy at law is available.  (Code Civ. Proc., §§ 1085-1086.)  Review by mandate "is often sought before trial to avoid the effect of a trial court's order or other ruling that will affect the conduct of the proceedings and that could not otherwise be challenged until after judgment is rendered."  (1 Bonneau et al., Appeals and Writs in Criminal Cases (Cont.Ed.Bar 3d ed. 2011) § 7.8, p. 354.)  Unlike the appeal following judgment, which is heard as a matter of statutory right, review by writ is at the discretion of the reviewing court.  "The discretionary aspect of writ review comes into play primarily when the petitioner has another remedy by appeal and the issue is whether the alternative remedy is adequate."  (*Powers v. City of Richmond* (1995) 10 Cal.4th 85, 113; see Code Civ. Proc., § 1086.)

At the time *Evans* was decided, we had long held that "pretrial discovery orders in criminal cases may, in certain instances, be reviewed by prohibition or mandate."  (*People v. Municipal Court (Ahnemann)* (1974) 12 Cal.3d 658, 661.)  The *Evans* court characterized the defendant's request for a lineup as an attempt to secure a form of pretrial discovery.  (See *Evans*, *supra*, 11 Cal.3d at p. 622.)  The need for a "speedy" remedy regarding a lineup motion is reflected in the description of the issue as "whether *prior* to the in-court receipt of evidence of identification" the accused can be afforded a lineup.  (*Ibid*.)  In creating the procedure, the *Evans* court observed that "an accused is entitled to the knowledge to be gained from a lineup sufficiently in advance of trial to prepare therefor."  (*Id*.

8

at p. 626.) The trial court has the discretion to deny a motion that is untimely. (*Ibid.*)[6]

A lineup's primary benefit arises *before* the witness encounters the defendant in court. Seeing a suspect among a group of individuals tests the accuracy of a witness's identification in a way different from an isolated encounter in the courtroom. "The question is whether *prior* to the in-court receipt of evidence of identification the accused can insist that procedures be afforded whereby the weakness of the identification evidence, if it is in fact weak, can be disclosed." (*Evans, supra*, 11 Cal.3d at p. 622.) For this reason, the value of a pretrial lineup may be diminished once a direct confrontation between defendant and accuser has occurred. If a lineup is improperly denied, the defendant should be able to correct that error before the direct confrontation in court.[7]

The question here is not whether a defendant may seek writ review of the denial of a lineup motion. That question was answered affirmatively in *Evans*, *supra*, 11 Cal.3d 617. Because the *Evans* court granted relief and the lineup was ordered, there was no need to discuss a postjudgment appeal. The question here is whether a defendant who is denied a lineup motion in the trial court and then fails to seek writ review of that ruling is barred from challenging it on postjudgment appeal.

The Court of Appeal imposed such a bar. It reasoned that if a lineup was improperly denied, reversal on appeal would be an imperfect remedy. Once seen

---

[6] We use the term "trial court," recognizing that the motion will be heard by the magistrate if it is made before the preliminary hearing or by the trial court if it is heard at that stage.

[7] In *Evans*, *supra*, 11 Cal.3d 617, the request for the lineup was made after the preliminary hearing and before trial. Evans was charged with robbing a restaurant owner, waitress, and customer. The restaurant owner was the only witness who testified at the preliminary hearing. He identified the defendant. (*Id.* at pp. 619-621.)

by the witness in the courtroom, the defendant could never be restored to the status quo ante. This consideration may indeed be one that might influence a reviewing court when determining whether to issue a peremptory or alternative writ.

However, in requiring an interlocutory petition for writ review, the Court of Appeal would severely limit the availability of appeal. Under the Court of Appeal's analysis, only a defendant whose petition for writ relief was summarily denied could attack the error on appeal.[8] A defendant who failed to seek writ relief would be precluded from raising the issue on appeal. Likewise, under existing law, a defendant who sought and was denied relief after issuance of an alternative writ would be foreclosed from raising the issue. "When the appellate court issues an alternative writ, the matter is fully briefed, there is an opportunity for oral argument, and the cause is decided by a written opinion. The resultant holding establishes law of the case upon a later appeal from the final judgment." (*Kowis v. Howard* (1992) 3 Cal.4th 888, 894.) Thus, the Court of Appeal's rule compels a defendant to seek a pretrial writ remedy and run the risk that posttrial appeal will be precluded. Because the right to appeal is statutory, such a limitation should be considered by the Legislature. (See *Powers v. City of Richmond*, *supra*, 10 Cal.4th at p. 110.)[9]

The Legislature has expressly provided for appellate review by extraordinary writ in particular situations.[10] In doing so, the Legislature has

---

[8] Although the Court of Appeal's approach would permit this subgroup of defendants to raise the issue on appeal, anomalously the problem of fashioning an appropriate remedy would remain.

[9] "[A]lthough the Legislature may regulate the mode of appellate review, it may do so only to the extent that it does not thereby ' "substantially impair the constitutional powers of the courts, or practically defeat their exercise." ' [Citations.]" (*Powers v. City of Richmond*, *supra*, 10 Cal.4th at p. 110.)

[10] As one treatise has explained: "A 'statutory writ' is not an independent type of writ; the term simply refers to particular situations in which review by a common law writ (mandate, prohibition or certiorari) is expressly authorized by

*(footnote continued on next page)*

10

approached the interaction between writ relief and postjudgment appeal in at least three ways.

First, as to some statutes, the Legislature has made writ relief the exclusive avenue to address trial court error. "[T]hroughout the years, the Legislature has found, in a variety of settings, that the need for a speedy, final determination of certain discrete issues arising in the course of trial litigation justifies the adoption of statutory provisions permitting a trial court's resolution of such issues to be challenged in an appellate court only through the prompt filing of a petition for extraordinary writ (and not in a subsequent direct appeal of the final judgment rendered in the case). The decisions of the California courts regularly have upheld and applied such legislative measures." (*Powers v. City of Richmond*, *supra*, 10 Cal.4th at p. 122, conc. opn. of George, J.) For example, under Code of Civil Procedure section 170.3, subdivision (d), "The determination of the question of the disqualification of a judge is not an appealable order and may be reviewed *only* by a writ of mandate from the appropriate court of appeal . . . ." (Italics added.) Under Code of Civil Procedure section 418.10, subdivision (c), a defendant in a civil case may only challenge by extraordinary writ a trial court order refusing to quash service, and may not raise the issue on appeal of the final judgment. (*McCorkle v. City of Los Angeles* (1969) 70 Cal.2d 252, 257 [so construing Code Civ. Proc., former § 416].)

Second, as to certain other statutes, the Legislature made writ review available, but also allowed for review on appeal. For example, under section

---

*(footnote continued from previous page)*

statute. [¶] . . . Statutory authorization for writ review in a particular situation does not *compel* the court to grant the writ petition. As where writ relief is sought strictly under the common law, appellate courts have discretion to summarily deny the petition." (2 Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2011) ¶¶ 15.85-15.86, p. 15-44.)

1538.5, a defendant may move to suppress evidence at the preliminary examination. (§ 1538.5, subd. (f)(2).) If the motion is denied, it may be renewed in a special hearing in superior court. If the motion fails again, the defendant can pursue writ relief. (§ 1538.5, subd. (i).) But a defendant who does not seek a writ review may yet challenge the magistrate's ruling on appeal following a conviction by plea or at trial. (§ 1538.5, subd. (m).) Similarly, under section 999a, a defendant may seek a pretrial writ if a court declines to set aside the information or indictment. (See § 995.) Even if a writ is not sought, a defendant may still seek review on appeal following the judgment, although the defendant must establish the error was prejudicial. (*People v. Pompa-Ortiz* (1980) 27 Cal.3d 519, 529.)

Finally, only in the context of dependency proceedings under the Welfare and Institutions Code has the Legislature adopted the procedure imposed by the Court of Appeal here. As to orders terminating reunification services and setting a selection and implementation hearing, the Legislature has provided that a party must seek writ review of that order as a condition to raising the issue on appeal of a final judgment terminating parental rights. (Welf. & Inst. Code, § 366.26, subd. (*l*)(1).) In doing so, the Legislature acted in direct response to our decision in *In re Matthew C.*, *supra*, 6 Cal.4th 386. There, we considered a former provision of the Welfare and Institutions Code providing that an order terminating reunification services and setting a Welfare and Institutions Code section 366.26 hearing "is not an appealable order, but may be the subject of review by extraordinary writ." (Welf. & Inst. Code, § 366.26, former subd. (k), as amended by Stats. 1989, ch. 913, § 17, pp. 3165, 3169.) We construed the provision to mean that the order setting such a hearing was a nonappealable interim order. It could, however, be reviewed immediately by extraordinary writ, and the findings subsumed within the order could also be raised on appeal from the final order terminating parental rights. (*In re Matthew C.*, *supra*, at pp. 400, fn. 13, 401.)

In reaching this conclusion in *In re Matthew C.*, *supra*, 6 Cal.4th 386, we noted that the phrase "not an appealable order" generally describes an

12

interlocutory order that is not immediately appealable, but is ultimately reviewable upon appeal from a final judgment. (*Id.* at p. 393.) We emphasized that legislative intent to abolish a right to appeal must be clearly stated, and any doubt should be resolved in favor of the right whenever " 'the substantial interests of a party are affected.' " (*Id.* at p. 394.) We observed that the Legislature had not included any statutory language circumscribing the right to appeal after a final order terminating parental rights. (*Id.* at p. 395.)

Nevertheless, we acknowledged there is a "legitimate policy concern" when orders concerning a child's permanent placement are delayed. (*In re Matthew C.*, *supra*, 6 Cal.4th at p. 400.) In a footnote, we suggested the Legislature address the problem of delayed appellate review: "As we construe the current statutory scheme, seeking writ review of the order terminating reunification services and setting a [Welf. & Inst. Code] section 366.26 hearing is permissible but not a condition for raising these issues on appeal. If the Legislature deems it appropriate, however, it could amend the statute to expressly provide that a party must seek writ review as a condition to later raising the issue on appeal from a final judgment, and to require that parties be explicitly advised of this requirement at the final review hearing." (*Id.* at p. 400, fn. 13.)

The Legislature responded and replaced Welfare and Institutions Code former subdivision (k) with subdivision (*l*) (Stats. 1994, ch. 1007, § 2, p. 5959), which provides that an order setting a Welfare and Institutions Code section 366.26 hearing is not appealable at any time unless a petition for extraordinary review was filed in a timely manner and the writ petition "was summarily denied or otherwise not decided on the merits." (Welf. & Inst. Code, § 366.26, subd. (*l*)(1)(A), (C).)

In similar fashion, the Legislature limited appellate review of orders designating the placement of the dependent child after parental rights have been terminated. Under Welfare and Institutions Code section 366.28, a timely writ

petition is the exclusive way to perfect the right to appellate court review of such orders. (Welf. & Inst. Code, § 366.28, subd. (b)(1)(A), (C).)

All of which brings us to this case. The opportunity to request a lineup is not a creature of statute, but a right conferred by this court in *Evans*, *supra*, 11 Cal.3d 617. When *Evans* was decided in 1974, "[t]his court ha[d] developed rules of criminal discovery in the absence of legislation." (*Hill v. Superior Court* (1974) 10 Cal.3d 812, 816, fn. 3.) As a result, the Legislature has never expressly addressed the availability of appellate review when a trial court denies a lineup motion.

When this court has been asked in other contexts to impose a writ requirement as a condition to seeking appellate review, we have declined. In *People v. Memro* (1985) 38 Cal.3d 658 (*Memro*), overruled on other grounds in *People v. Gaines* (2009) 46 Cal.4th 172, 181, footnote 2, the trial court denied the defendant's request for discovery of complaints that police officers had used excessive force. The prosecution argued that the defendant had forfeited appellate review by failing to seek a pretrial writ. In refusing to impose such a requirement, we stated: "While respondent correctly notes that pretrial review is appropriate in discovery matters [citations], he fails to cite any authority for the proposition that such review is a prerequisite to review of discovery error on appeal." (*Memro*, *supra*, at p. 675.) Additionally, we observed that a pretrial writ requirement might add unnecessary delay and expense, and would limit this court's exercise of appellate jurisdiction by resolving issues through writ procedure instead of on direct appeal. (*Ibid.*) We noted the reluctance of courts in other contexts to impose barriers to appellate review when important rights are involved (*id.* at p. 676, and cases cited therein) and concluded that since discovery rights are equally important, "this court declines to impose a pretrial writ requirement as a condition to review on appeal" (*ibid*).

Later, in *People v. Batts* (2003) 30 Cal.4th 660, we adopted the reasoning of *Memro*, *supra*, 38 Cal.3d 658, to conclude that a defendant who challenges the

14

denial of a motion to dismiss on double jeopardy grounds is not required to seek writ review in order to preserve the issue for appeal. (*People v. Batts*, at pp. 677-678.)

*Memro* cited various policy reasons to support its holding. We need not revisit the merits of those policy reasons or resolve whether they apply with equal force here. As this court did in *Memro* and *People v. Batts*, we decline to impose such a mandatory requirement. Here, we hold that in the absence of statutory limitation, a trial court's denial of a lineup motion is a prejudgment order that falls within the scope of section 1259, entitling a defendant to raise the issue on appeal. Whether application for a pretrial writ should be the exclusive remedy or should be required to preserve the issue for appeal are questions for the Legislature.

## C. Appellate Review of Denial of a Lineup Motion

Defendant points out that the decision to forgo writ review "imposes [certain] costs." He acknowledges that by waiting until after final judgment to seek appellate review, a defendant must demonstrate not only error in the denial of the lineup motion, but also prejudice occasioned by the error. We turn to the analysis of prejudice on appeal, first determining the applicable standard and then discussing its application generally.

### 1. Standard of Prejudice

Although the *Evans* court concluded that a defendant has a "due process" right to a lineup in appropriate circumstances (*Evans*, *supra*, 11 Cal.3d at p. 625), *Evans* did not specify whether the procedure it approved was grounded in federal or state due process. Relying on federal due process, defendant urges that we must apply the standard of *Chapman*, *supra*, 386 U.S. 18, 23-24, requiring demonstration by the prosecution that the error was harmless beyond a reasonable doubt. Conversely, the Attorney General argues the presumed error here resulted in a denial of state due process. Thus, the applicable standard is found in *Watson*, *supra*, 46 Cal.2d 818, requiring defendant to show it is reasonably probable he

15

would have obtained a more favorable result absent the error. (*Id*. at p. 836.) The Attorney General has the stronger position.

The question in *Evans* was whether trial courts had the *authority* to compel the police to conduct a lineup. *Evans* concluded that "[b]ecause the People are in a position to compel a lineup and utilize what favorable evidence is derived therefrom, fairness requires that the accused be given a reciprocal right to discover and utilize contrary evidence." (*Evans*, *supra*, 11 Cal.3d at p. 623.) The *Evans* court analogized to *Wardius v. Oregon* (1973) 412 U.S. 470 (*Wardius*). There, the United States Supreme Court held that an Oregon statute violated the Fourteenth Amendment's due process clause in requiring a defendant to provide alibi information before trial without imposing a reciprocal discovery obligation on the state. (*Id*. at pp. 474-476.) The Supreme Court stated that "[a]lthough the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded, [citation], it does speak to the balance of forces between the accused and his accuser." (*Id*. at p. 474.) The high court further noted that although due process did not require Oregon to adopt any pretrial discovery provisions, if it did, "discovery must be a two-way street." (*Id.* at 475.)

*Wardius*, *supra*, 412 U.S. 470, requires only that certain discovery obligations be reciprocal. (*People v. Yeoman* (2003) 31 Cal.4th 93, 154.) It does not entitle a defendant to a lineup as a matter of federal constitutional right. Indeed, the high court in *Wardius* rejected the notion that federal due process requires a particular means of discovery. (*Wardius*, *supra*, 412 U.S. at p. 475.) Rather, as we applied *Wardius* in *Evans*, the defendant has the right to *request* a lineup and the court has the *discretion* to order it. Because the defendant was empowered to seek a lineup, the reciprocity concern of *Wardius* is satisfied.

In concluding that courts can order a lineup in response to a defendant's motion, the *Evans* court also loosely referred to *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*). Citing *Brady*, the *Evans* court stated: "Here petitioner seeks to compel the People to exercise a duty to discover material evidence which does not

16

now, in effect, exist.  Should petitioner be denied his *right of discovery* the net effect would be the same as if existing evidence were intentionally suppressed.  It is settled that the intentional suppression of material evidence denies a defendant a fair trial." (*Evans*, *supra*, 11 Cal.3d at p. 625, italics added, citing *Brady*, at p. 87.)  The analytical leap by the *Evans* court from suppression of actual evidence to the failure to acquire nonexistent but potentially extant information was expansive and unsupported.

Under *Brady*, the prosecution violates due process when it withholds evidence that is favorable to the accused and is material either to guilt or to punishment.  (*Brady*, *supra*, 373 U.S. at p. 87.)  Evidence is "favorable" to the accused "if it helps the defense or hurts the prosecution." (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1132.)  Evidence is "material" "if there is a reasonable probability its disclosure would have altered the trial result." (*Ibid.*)

In citing *Brady*, *supra,* 373 U.S. 83, the *Evans* court did not mention that the suppressed evidence must be "favorable," and did not employ the term "material" as that word is defined in *Brady*.  The *Evans* analysis failed to explain how nonexistent evidence could be either favorable or material.  Nevertheless, the *Evans* court appears to have relied on *Brady* only as further support for its conclusion that a defendant must be afforded an *opportunity* to seek a court-ordered lineup.  As subsequent federal cases make clear, the *Evans* court's characterization of *Brady* and its scope has proven overbroad.

*Brady*, *supra*, 373 U.S. 83, does not stand for the proposition that a defendant has a federal constitutional right to a lineup or generally to compel certain kinds of investigation.  In *Weatherford v. Bursey* (1977) 429 U.S. 545, the United States Supreme Court stated:  "There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one . . . ." (*Weatherford v. Bursey*, at p. 559.)  *Brady* merely serves " 'to restrict the prosecution's ability to *suppress* evidence rather than to provide the accused a right to criminal discovery.' " (*People v. Morrison* (2004) 34 Cal.4th 698, 715, italics added.)

17

When a motion for a lineup is made, neither the prosecution nor the police have suppressed or destroyed favorable evidence or wrongfully denied a discovery request. Indeed, at the time the lineup motion is made, there is no evidence available to disclose.

The United States Supreme Court has never held that a defendant has a constitutional right to compel a pretrial lineup. The Ninth Circuit Court of Appeals has expressly rejected any constitutional dimension to a defendant's request for a lineup. (See *United States v. Robertson* (9th Cir. 1979) 606 F.2d 853, 857 ["An accused has no absolute or constitutional right to a lineup"].) All but one of the remaining regional federal circuits have held there is no federal constitutional right to a lineup. (See, e.g., *United States v. Hurt* (D.C. Cir. 1973) 476 F.2d 1164, 1168; *United States v. Estremera* (2d Cir. 1976) 531 F.2d 1103, 1111; *United States v. Hall* (3d Cir. 1971) 437 F.2d 248, 249; *United States v. White* (4th Cir. 1973) 482 F.2d 485, 488; *Branch v. Estelle* (5th Cir. 1980) 631 F.2d 1229, 1234; *United States v. Causey* (6th Cir. 1987) 834 F.2d 1277, 1286; *United States v. Jackson* (7th Cir. 1987) 835 F.2d 1195, 1198; *United States v. Ostertag* (8th Cir. 1980) 619 F.2d 767, 711; *Haskins v. United States* (10th Cir. 1970) 433 F.2d 836, 838; *Code v. Montgomery* (11th Cir. 1984) 725 F.2d 1316, 1320, fn. 4.)[11]

We are mindful that for almost four decades our decision in *Evans* has been the controlling authority guiding a trial court's exercise of discretion in ruling on defense motions for pretrial lineups. Because this court has never determined that

---

**11** As to the First Circuit, in *Appeal of McGuire* (1st Cir. 1978) 571 F.2d 675, the federal appeals court considered a defendant's refusal to participate in a lineup, rather than a defendant's request for a lineup. The court stated: " 'The line-up is intended for the protection of the individuals' constitutional rights in order to avoid improper suggestiveness in any confrontation. If they elect to dispense with that protection, the decision is theirs alone, and they cannot properly be heard to complain.' " (*Id.* at p. 677.)

a denial of such a motion was an abuse of discretion, we have never been required to identify the basis of the due process right discussed in *Evans*. In light of the foregoing analysis and federal court pronouncements, we clarify that the source of the important due process right identified in *Evans, supra*, 11 Cal.3d 617, is the California Constitution. Therefore, error is analyzed under the test articulated in *Watson*, *supra*, 46 Cal.2d at page 836.

### 2. *Demonstration of Prejudice*

Defendant focuses on the availability of an appropriate remedy for the presumed error rather than the threshold question of whether prejudice resulted. The Court of Appeal, in concluding that a defendant must first pursue writ relief when a request for a lineup is denied, opined there is no adequate remedy on appeal: "If a defendant forgoes writ review of the lineup ruling, and instead undergoes a preliminary hearing and trial, the witness will have ordinarily viewed the defendant at the preliminary hearing and/or at trial. Even if an appellate court reversed and ordered a lineup on remand, the results of that lineup would have no evidentiary value: a positive identification would be tainted by the fact the witness saw the defendant at trial, and a negative identification would be tainted by the lengthy passage of time during which fading memories and changing appearances would operate." Defendant asserts that, on the contrary, an appropriate remedy would be remand for a new trial with a jury instruction allowing the jury to infer that if a lineup had been held the witness would have been unable to identify the defendant. The question of remedy, however, is premature.[12]

---

[12] Defendant's argument and the Court of Appeal's concern as to the adequacy of remedy should prejudicial error be demonstrated are policy considerations more properly addressed by the Legislature if it chooses to impose a prerequisite or alternative to appellate review. (*Ante*, at p. 15.)

19

Defendant puts the cart before the horse.  Before he can demand a remedy, he must first establish that he was prejudiced by the trial court's error.  As noted, under *Watson*, a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.  (*Watson*, *supra*, 46 Cal.2d at p. 836.)  Prejudice under *Watson* "must necessarily be based upon reasonable probabilities rather than upon mere possibilities."  (*Id*. at p. 837.)  The dilemma for a defendant in this circumstance is that the trial court erred in denying the *opportunity* for a lineup.  The outcome of that lineup is unknown because it was never conducted.  "[I]t has long been recognized that '[i]n the case of in-court identifications not preceded by a lineup . . . , the weaknesses, if any, are directly apparent at the trial itself and can be argued to the court and jury . . . .' [Citations.]"  (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1155.)  This court's decision in *Evans*, *supra*, 11 Cal.3d 617, "did not overrule the principle that an identification made in front of the jury carries with it the circumstances under which it was made, which, in turn, can be argued to and weighed by the jurors." (*People v. Breckenridge* (1975) 52 Cal.App.3d 913, 936.)

There may be some circumstances in which a defendant would be able to establish prejudice.  However, many attempts to do so will founder on the shoals of speculation.  The mere assertion that the witness might *possibly* have failed to make a positive identification cannot demonstrate prejudice under *Watson*.  A contrary conclusion confers a windfall on a defendant who forgoes writ relief and proceeds to trial.  In that circumstance, the defendant could argue prejudice on appeal simply by asserting that the witness *might* have failed to make the identification.  However, if the defendant had been successful on the writ and obtained a lineup, the defendant may have been identified.

Establishing prejudice is even more problematic when, as here, the witness fails to identify the defendant at trial or is uncertain.  Again, any suggestion as to the outcome of an erroneously denied lineup would rest on speculation.  It is possible the witness would have identified the defendant at the lineup.  But even if

20

the witness failed to do so or was uncertain, the defendant would have gained little or nothing of evidentiary value in light of the witness's failure to make an identification before the jury.

The tactical decision whether to seek immediate writ review or wait until after judgment to bring a direct appeal is an individualized one that involves consideration of potential risks and rewards. It is true, as defendant asserts, that seeking writ review requires additional effort and may cause delay. In fact, a decision to assert a misidentification defense gives rise to a number of tactical choices. For example, requesting an *Evans* lineup in the trial court has the potential for both positive and negative results. A defendant who is confident that a witness cannot make a lineup identification may wish to press the issue and then be able to point to the witness's failure. A defendant who is less confident of that outcome may not want to risk an identification. In the latter case, the defense may conclude that the wiser course is not to seek a lineup and argue at trial that no lineup was provided, thus attacking the witness's in-court identification as unfairly tested by law enforcement.

If the lineup motion is made and denied, tactical factors remain in deciding whether to seek a writ. As illustrated here, one of those factors is the requirement of establishing prejudice on appeal. A showing of prejudice is, obviously, not required in a writ proceeding. Indeed, the purpose of seeking review is to foreclose any irremediable detriment that might ensue if the writ relief is not granted. However, seeking and securing writ relief may be a Pyrrhic victory if a witness does identify the defendant in the lineup sought. On the other hand, not seeking writ relief allows the defense to raise the denial of the lineup as an appellate issue after judgment. But to succeed, that appellate claim will require the defendant to establish error *and* show prejudice.

21

**D. Any Error in Denying Defendant's Motion for a Lineup Was Harmless**

We turn now to the merits of defendant's claim. The Court of Appeal assumed the trial court abused its discretion in denying the lineup motion. It applied the more rigorous *Chapman* standard (*Chapman*, *supra*, 386 U.S. 18) and concluded that any error was harmless beyond a reasonable doubt, stating: "Mena asserts the erroneous ruling deprived him of evidence that Jesus would *not* have identified him in a lineup conducted in June of 2007 (near the time of Mena's *Evans* motion), and we should reverse and instruct the jury on remand to that effect. However, Jesus testified at trial that he did not recognize Mena as one of his attackers, and he had *not been able to identify Mena as one of his attackers in June of 2007* when he saw Mena at the preliminary hearing." Thus, the jury convicted defendant even though it heard testimony substantially identical to the evidence of which defendant claimed he was deprived when not afforded a lineup.

We also assume, without deciding, that the trial court erred in denying defendant's lineup motion. Applying the *Watson* standard (*Watson*, *supra*, 46 Cal.2d 818), we conclude that any such error would have been harmless under the particular circumstances of this case. Indeed, our conclusion would be the same even under *Chapman*.

Defendant argues it is wrong to consider Jesus's failure to identify him in court as a weakness in the prosecution's case or to conclude that the lineup would have added nothing of evidentiary value. He urges that the prosecutor turned Jesus's failure to identify into affirmative evidence of guilt by insinuating that Jesus was too frightened to make an identification. Defendant contends the lineup evidence would have defeated this argument. Defendant's assertion fails.

At trial, the prosecutor questioned Jesus about his identifications at the curbside showup. Jesus said he had not wanted to look at the detained men "[b]ecause that would have made me — because I didn't want to." The prosecutor then asked Jesus about the consequences of being a "snitch." Jesus testified that a

22

"snitch" could be killed or hurt, and that his neighborhood friend had been shot two years earlier. Jesus confirmed his own worry that he would be killed or hurt. On cross-examination, Jesus stated that when he arrived at the showup, he was concerned about being recognized.

The prosecutor asked Jesus: "When you made those identifications back in April were you telling the truth to the best of your ability?" Jesus answered, "Yes." Jesus confirmed the men he pointed out at the curbside showup were the men who had been involved in the chase. On cross-examination, he did acknowledge testifying at the preliminary hearing that he was "90 percent" certain of his identification at the curbside showup.

When asked at trial whether he recognized anyone who was involved in the attack, Jesus said, "No." The prosecutor asked, "Are you saying these guys were not involved?" Jesus replied, "I'm not sure." Jesus also testified that he could not identify anyone at the preliminary hearing, and had also been unsure at that proceeding. Jesus told the prosecutor that he did not want to testify at trial, and was doing so only because he was subpoenaed. The following colloquy ensued:

"Q. Did you want to be here back in June [at the preliminary hearing]?

"A. No.

"Q. How come?

"A. Because I just didn't want to. I want to leave everything as it is.

"Q. You want to leave everything as it is?

"A. Yes.

"Q. Are you worried about something happening to you?

"A. Yes."

In closing argument, the prosecutor told the jury that, in evaluating a witness's credibility, it must consider possible reasons why a witness said or did not say something. The prosecutor continued: "It is a lot different sitting in that chair up there just a few feet away from some people that did some very violent things and being asked to look at those people and identify them as guilty parties

23

as people who participated [than] it is to sit in the back of a patrol car with armed officers in the front seat where those people can't see you." The prosecutor argued, "I would submit to you [Jesus] was scared stiff when he was in here when I asked him to look around the courtroom. . . . He could barely look over to the left side of the courtroom. His eyes flashed over there for a second and he said, 'No, I do not recognize anybody.' He is scared stiff. He doesn't live in this courtroom. . . . He's got to go back and walk on those streets. That is something that you can consider in deciding whether or not he was giving truthful, accurate testimony or not. [¶] It doesn't change the fact that he didn't ID them. What I'm saying is a failure to identify in court doesn't mean that these defendant[s] are not guilty."

Defendant asserts that the prosecution's argument would have been undermined had the court ordered a lineup. According to defendant, the prosecutor acknowledged that Jesus "was not fearful" when he viewed the suspects from the rear of the patrol car because he was protected and could not be seen. Defendant maintains that during a police-supervised lineup, Jesus would have viewed defendant and others from behind one-way glass. If Jesus had failed to identify him in a lineup shortly after the crimes, the prosecutor could not have credibly argued that Jesus did not make an in-court identification because he was afraid. Defendant urges, "the results of the lineup would have provided crucial evidence that Jesus C. had misidentified Mena at the curbside showup, and that his failure to identify Mena at the preliminary hearing and trial was not the result of intimidation." These arguments miss the mark.

First, the prosecutor did not argue that Jesus "was not fearful" during the curbside showup. Indeed, there was clear evidence to the contrary. The prosecutor merely distinguished the circumstances of the showup from the more intimidating setting of an in-court identification.

More importantly, however, defendant's argument assumes that Jesus would not have identified him at a lineup. Defendant attempts to establish

24

prejudice by arguing the failure to order a lineup effectively excluded "evidence that Jesus C. would not have been able to identify Mena in a formal lineup." Defendant's argument illustrates the dilemma for reviewing courts on appeal from a judgment. It rests on sheer speculation. It simply cannot be determined what Jesus might have said or done at a lineup. He might have identified defendant, or affirmatively said defendant was not his assailant, or, as he did at both the preliminary hearing and trial, said he could not identify anyone because he was uncertain.

The best outcome from defendant's perspective would have been a firm statement from Jesus that his attacker was not in the lineup. In light of his repeated in-court testimony, which was substantially less definitive, such a result appears unlikely. Yet, even if Jesus had expressly said his assailant was not in the lineup, the prosecutor could still have argued Jesus acted out of fear. The incident occurred on April 13, 2007. The lineup motion was argued on May 29, 2007, a little more than a week before the June 6 preliminary hearing. At that hearing, Jesus was a reluctant witness. Had a lineup been conducted where Jesus made no identification, the prosecutor could have reasonably argued at trial that Jesus was acting with the same reluctance he displayed at the preliminary hearing. Neither the presence of police nor the protection of one-way glass could have ensured the secrecy of any identification Jesus made. The result of his lineup statement would have been revealed during discovery and his appearance and testimony would make his identity known to those inclined to retaliate. Defendant fails to establish on this particular record that, but for the trial court's failure to order the lineup, he would have obtained a more favorable result. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

Defendant also argues the harmless error standard cannot be satisfied because the balance of the evidence against him was not strong. This argument also fails. It is true that some harmless error conclusions are reached by relying on the overall strength of the evidence of guilt. Such an approach is not the thrust of

25

our analysis here. We are concluding that any assumed error was harmless because, even if defendant had been given a lineup, no foreseeable outcome from that procedure would have further assisted him.

### III. DISPOSITION

The Court of Appeal erred in holding that defendant forfeited his right to appeal the denial of his lineup motion by failing to pursue writ relief. However, it correctly concluded that the trial court's error, if any, was harmless. For this reason, we affirm the judgment.

**CORRIGAN, J**.


**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**KENNARD, J.**
**BAXTER, J.**
**WERDEGAR, J.**
**CHIN, J.**
**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Mena

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 173 Cal.App.4th 1446
**Rehearing Granted**

_____

**Opinion No.** S173973
**Date Filed:** May 31, 2012

_____

**Court:** Superior
**County:** San Diego
**Judge:** Bernard E. Revak*

_____

**Counsel:**

John P. Dwyer, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala G. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Barry Carlton, Susan Miller, Steven T. Oetting and Eric A. Swenson, Deputy Attorneys General, for Plaintiff and Respondent.

*Retired judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

John P. Dwyer
Law Offices of John P. Dwyer
601 Van Ness Avenue, Suite E-115
San Francisco, CA 94102
(415) 885-4451

Eric A. Swenson
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA 92101
(619) 645-2216