Filed 3/28/14  In re J.J. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re J.J., a Person Coming Under the Juvenile Court Law. | H039798 (Santa Cruz County Super. Ct. No. DP002068) |
| SANTA CRUZ COUNTY HUMAN SERVICES DEPARTMENT,<br><br>　　　Plaintiff and Respondent,<br><br>　　　　v.<br><br>A.J.,<br><br>　　　Defendant and Appellant. | |

In March 2009, the Santa Cruz County Human Services Department (Department) filed a petition under Welfare and Institutions Code section 300, subdivision (b).[1] It alleged the failure of the mother, A.J. (Mother), and father, D.J. (Father), to adequately supervise or protect and provide regular care for their son, J.J. (now seven; the minor). In May 2009, the juvenile court sustained the allegations of the petition, declared the minor a dependent child, and allowed him to remain in Mother's care and custody, subject to the Department's supervision. In October 2010—after Mother's relapse and further drug

---

[1] Further statutory references are to the Welfare and Institutions Code unless otherwise stated.

use had resulted in her incarceration—the minor was removed from Mother's care and placed in the home of his maternal grandmother, T.H. (Grandmother). The court ordered reasonable reunification services, which were provided to the parents; reunification services were terminated in November 2011.

Ultimately in June 2013—more than four years after the commencement of the dependency proceedings—the juvenile court issued an order after the permanency hearing that is the subject of this appeal. The court (1) found the minor to be adoptable (thereby reconfirming its adoptability finding made a year earlier when it had found legal guardianship to be appropriate as the permanent plan); (2) concluded that the beneficial parental relationship exception was inapplicable; (3) selected a permanent plan of adoption; and (4) terminated the parental rights of Mother and Father.

On appeal, Mother contends the juvenile court erred in concluding that she had not met her burden of establishing the beneficial parental relationship exception to adoption. We conclude the trial court did not err. Accordingly, we will affirm the order declaring adoption as the permanent plan for the child, J.J., and terminating the parental rights of Mother and Father.

FACTS AND PROCEDURAL HISTORY

I.      *Initial Petition and April 2009 Order*

On March 13, 2009, the Department filed a petition alleging that the parents had failed to supervise or protect the minor, were willful or negligent in failing to supervise or protect him adequately from the conduct of the custodian with whom he had been left, and were unable to provide regular care for him due to their mental illness, developmental disability, or substance abuse. (§ 300, subd. (b).) The Department

alleged,[2] among other things, that in February 2009, Mother had been arrested by Morgan Hill police officers for child endangerment and possession of drug paraphernalia. The incident involved Mother's having left her three-year-old nephew, T., unsupervised in a parking lot in an unlocked car while she went grocery shopping with the minor; upon response by law enforcement, methamphetamine and drug paraphernalia were found in the car.[3] Mother told the social worker afterward that she regretted her decision to leave her nephew unattended in the car. She also admitted she had been smoking marijuana since she was 14; had been using methamphetamine since she was 21; and had very recently smoked marijuana and methamphetamine.[4]

After the incident, in February 2009, the Department offered voluntary family maintenance services to Mother to obviate the need for the minor's removal, but she failed to follow through with the offered services. Because of Mother's ongoing use of methamphetamine and marijuana—and notwithstanding her past participation in multiple residential and outpatient drug treatment programs—Mother was unable to provide regular and proper care for the minor. Mother's continued drug use placed the minor at serious risk of physical harm because of her being under the influence and/or her leaving drugs and paraphernalia within reach of her child. Father was incarcerated as a result of

---

[2] For convenience and to avoid repetition in this paragraph and the subsequent two paragraphs, we will avoid using the phrase "the Department alleged" to describe the allegations contained in the petition. We will follow the same practice to describe the allegations in other reports submitted by the Department as described, *post.*

[3] An attachment to the petition included additional details about the event. On February 4, 2009, Morgan Hill police officers responded to a report of a child, three-year-old T., having been left alone in a car in a Safeway parking lot for approximately 35 minutes. After Mother came out with the minor, she indicated to the police that when she had gone into the store, T. was with his mother in the car. She later admitted she had left T. in the car unsupervised. The officers' search of the car yielded 2.46 grams of white crystallized substance that later tested as presumptive for methamphetamine, along with four glass methamphetamine pipes and a straw containing a white powdery substance.

[4] Mother was 28 years old when the petition was filed.

domestic violence charges during this time period. His criminal behavior and absence due to imprisonment placed the minor at risk of neglect and physical and emotional harm and illness.[5]

On April 21, 2009, the court ordered that the minor not be detained and that he be allowed to continue to live with Mother as long as she stayed in a drug treatment program.

II.     *Jurisdiction/Disposition Report and May 2009 Hearing*

In its May 2009 jurisdiction/disposition report, the Department repeated many of the allegations in the petition. It indicated that Mother had multiple drug-related arrests and/or convictions since 2002. Mother had tested positive for amphetamine and methamphetamine on February 20, 2009, and she had failed to make appointments for two other drug tests in March 2009. It was also reported that she had previously completed three drug treatment programs: the Hope Treatment program in San Mateo in 2002, the Bridges Program in December 2006, and the Women's Recovery Residential Treatment Program in 2007. She reported that after completing the last program, "she remained clean and sober for a while. However, her brother was using drugs in Watsonville and she relapsed."

Father had a number of arrests and convictions—mostly drug-related—dating back to 1993, and at the time of the report was incarcerated in Soledad State Prison.

---

[5] It was indicated in a narrative attached to the petition that there had been two July 2008 reports to the Department of potential abuse/neglect involving the minor. The first report was that Mother had been arrested on July 13, 2008, "for meth" at a trailer owned by Grandmother. Although the narrative indicated that Grandmother had confirmed her awareness that Mother had a drug problem, and that Mother's sister "also had a meth problem," the allegation of neglect was determined by the Department to be unfounded. A second report of neglect of July 28, 2008, was also determined by the Department to be unfounded.

There was an effective domestic violence restraining order pending against Father in which Mother and the minor were the protected persons.

The Department recommended that the minor be declared a dependent child to remain in Mother's home, and that Mother receive family maintenance services.

A jurisdictional/dispositional hearing took place on May 12, 2009, in which the Department, Mother, Father, and the minor all appeared through counsel. The court sustained the allegations of the petition, found it had jurisdiction over the minor pursuant to section 300, subdivision (b), and ordered placement of the minor with Mother, subject to the Department's supervision. It also made findings that the Department had provided notice pursuant to the Indian Child Welfare Act (ICWA), and that the ICWA did not apply.

III.     *First Six-Month Review Report and October 2009 Hearing*

In its report filed in connection with the six-month review hearing, the Department indicated that Mother had been working and had reported that she hoped to move within a few weeks to a Sober Living Environment program for families with children in a neighboring county. Mother had entered a residential treatment program on March 14, 2009, had graduated on June 16, 2009, and had been attending regular NA meetings. She had not missed or tested positive for any drug tests. She had also completed an eight-week Positive Discipline for Parenting in Recovery series. The social worker also opined that Mother had "been a consistent participant in Family Preservation Court" since April 29, 2009.

The social worker indicated that Mother "ha[d] consistently advocated for [the minor's] needs." Specifically, it was indicated that the minor had delayed speech issues and Mother had advocated for continuous speech therapy for him. The social worker also indicated that Mother had "consistently demonstrate[d] attention to [the minor's] safety and [had] parent[ed] him with a calm, firm style."

5

At the six-month review hearing on October 6, 2009, the court ordered that the minor continue to be a dependent child of the court. It ordered further that Mother and Father continue to receive family maintenance services.

IV. *First Twelve-Month Review Report and April 2010 Hearing*

In April 2010, the Department filed a twelve-month review report. Mother had been living in a Sober Living Environment; was involved in a twelve-step program; had attended Family Preservation Court; and was still working up to 40 hours per week as an assistant manager at a coffee shop. The Department reiterated that she had "consistently advocated for [the minor's] needs." It was also noted that Mother had volunteered daily in the minor's Head Start classroom. The Department indicated that there were concerns Mother had begun using drugs again, based upon, among other things, a report in January 2010 that she had methamphetamine in her possession; a report that Mother's twin sister was drug-testing for her; and the fact that some drug tests involved urine samples that may have been diluted. It was reported at that time, however, that there had been no positive tests or erratic behavior to confirm these concerns.[6]

The twelve-month review hearing occurred on April 13, 2010. The court adopted the recommendations of the Department; ordered that the minor continue as a dependent child under the care of the Department with approval for placement with Mother; and ordered that family maintenance services continue to be provided to Mother and Father.

V. *Supplemental Petition and October 2010 Hearing*

The Department filed a supplemental petition on September 9, 2010, pursuant to section 387, recommending that the minor be placed with a relative. It alleged that Mother had relapsed; she had shown signs of drug use and had tested positive for amphetamines on February 26, July 16, and August 16, 2010. Mother was remanded into

---

[6] This statement was contradicted in a later report by the Department, in which it was indicated that Mother had tested positive for amphetamines on February 26, 2010.

6

custody by her probation officer on August 18, 2010, based upon her positive drug tests and "suspicious behavior surrounding drug-testing." There was evidence that during two blood tests in August, Mother had attempted to cheat on the blood test by concealing urine samples on her person. The Department alleged that Mother was not in compliance with her court-ordered case plan, and her untreated substance abuse left her unable to care for the minor.

On October 21, 2010, the court sustained the section 387 petition. It found that the previous disposition of the minor had not been effective in the protection of the minor. It continued the minor as a dependent child; ordered his removal from Mother's custody; and ordered his placement with Grandmother. The court also ordered that reasonable reunification services be provided to Mother and Father, and that Mother be afforded at least weekly supervised visitation of the minor while she was incarcerated, increased to twice weekly upon her release from custody, with a social worker having the discretion to increase visitation. Neither Mother nor Father appealed this order.

VI.    *Second Six-Month Review Report and April 2011 Hearing*

In its April 2011 six-month review report, the Department indicated that the minor was living with Grandmother, who was "very involved with obtaining services for [the minor], who has many special needs." Mother was living with friends and had been participating since November 2010 in the Sobriety Works Program; the director reported that Mother had been making very good progress in the program. Mother was also participating in Family Preservation Court. She was unemployed but looking for work.

The Department also noted that Mother had been involved in two incidents with the police. On January 15, 2011, Mother was pulled over by law enforcement and cited with displaying false license plates (Veh. Code, § 4462.5). And on February 1, 2011, she was again pulled over while driving with the minor; she was charged with willful cruelty to a child (Pen. Code, § 273a, subd. (b)) and false personation of another (Pen. Code, § 529). In the latter case, Mother had driven with the minor in her car, notwithstanding that

her case plan prohibited her from being with her son on an unsupervised basis. When she was stopped, she identified herself to law enforcement as her twin sister. The officer cited her for having an improper car seat and for false personation. It was also reported that, although Mother's driver's license had been suspended, she had continued to drive, and at least once transported her son in her car. The Department also noted that Father had been arrested and incarcerated for making threats and for violating a restraining order. As a result, Grandmother had moved with the minor to an undisclosed location.

The Department made the assessment that because "the risk remains high, there is not a substantial probability that the minor will be returned home at this time." It recommended that the parents be offered an additional six months of family reunification services. At the hearing on April 12, 2011, the court adopted the Department's recommendations. It continued the minor as a dependent child of the court to remain under Grandmother's care and custody and ordered that the parents continue to receive reunification services.

VII.    *Second Twelve-Month Review Report and November 2011 Hearing*

In an October 2011 report, the Department indicated that it had received a report on June 3, 2011, from the program coordinator of Santa Cruz Recovery Program. The program coordinator reported that she had observed Mother smoking suspected methamphetamine. Mother denied drug use, but a drug test proved positive for methamphetamine. After initially lying about how Mother had obtained the drugs, Mother indicated that she had been given them by a friend who had met her outside the facility. After Mother was discharged from Santa Cruz Recovery Program, she enrolled in the Janus program, but she left that program on June 17, 2011. Mother then moved to Rebele Shelter, but on July 20, 2011, the social worker was contacted by a staff member of the shelter who indicated that there had been complaints about Mother's boyfriend hanging out in his car near the shelter, sometimes staying overnight, and dealing drugs. It was further reported that Mother had entered the Matrix program on July 15, 2011, had

8

gone into a three-day detox program in San Mateo later that month, and had then returned to Sobriety Works. The Department summarized: "After 30 months of services, not much is different in [Mother's] behavior that would indicate a substantive change has occurred. [Mother] has difficulty maintaining sobriety and continues to enter programs only to be discharged for using drugs. In the last reporting period[,] she has been in three treatment programs and has not successfully completed any of them. It is obvious that [Mother] loves her son and has a close relationship with him[;] however, she has failed to make behavioral changes."

It was reported that Mother had been having supervised visits with the minor twice a week at the Parents Center and had an additional weekly visit which was supervised by Grandmother. There had been a report on July 20, 2011, that the minor had been stealing rubber gloves from his school classroom. In response to an aide's question about what he planned to do with the gloves, the minor "stated that he was going to 'pee in them for mommy.'" Mother denied having used the minor's urine for drug testing.

The Department viewed the risk of returning the minor to the parents' care as being too high. It recommended that the court terminate reunification services, institute a permanent plan of adoption, and set a permanency hearing under section 366.26 (hereafter, referred to as .26 hearing or permanency hearing).

In a supplemental report, the Department indicated that on November 11, 2011, the director of Sobriety Works reported that Mother had tested positive for methamphetamine. Mother denied having used drugs and challenged the test's validity; she was retested and the test was again positive. Mother was suspended from the program for 72 hours. The director of Sobriety Works indicated in a follow-up telephone call to the Department that Mother had returned to the program after her suspension. She again tested positive for methamphetamine, and was discharged from the program on November 14, 2011. Mother was permitted to continue with her group at Sobriety

9

Works; on November 17, 2011, the director again tested Mother, and the test was positive for methamphetamine.

Mother filed a response to the Department's twelve-month review report. The response, signed by Mother herself,[7] indicated, among other things, that she did not believe her drug addiction to be a major issue. Mother wrote: "I believe that my addiction is not my major issue. Drugs were not my problem, drugs caused problems, but they were my solution. However, not anymore. My drug use is a symptom of my PTSD."

At the contested hearing on November 28, 2011, the court adopted the recommendations of the Department, continued the minor as a dependent under Grandmother's custody and care, and ordered that reunification services for Mother and Father be terminated. The court ordered that Mother receive supervised visitation of the minor at least twice per month. It found, among other things, that continuance in the parents' home would be contrary to the minor's welfare; the Department had complied with the case plan by making reasonable efforts to return the minor to the home; by clear and convincing evidence, the parents had been offered and provided reasonable reunification services; and Mother's progress toward alleviating or mitigating the causes that had required the minor's placement in foster care had been minimal. The court set a .26 hearing for April 3, 2012. Neither Mother nor Father sought review of this order.

VIII. *Supplemental Petition and First .26 Hearing (May-June 2012)*

On February 14, 2012, the Department filed a second supplemental petition pursuant to section 387. The Department recommended that the minor be placed in foster care due to Grandmother's failure to appropriately supervise and protect him. It was

---

[7] Mother was represented by counsel. Her attorney signed and filed a cover sheet indicating that Mother requested that her personally prepared response attached to the cover sheet be considered by the court.

alleged, among other things, that Grandmother had allowed minor to have unauthorized and unsupervised contact with Mother. At a hearing on February 16, 2012, the Department withdrew its recommendation and asked that the minor continue in Grandmother's care, pending adjudication of the section 387 petition under a safety plan. One month later, the court granted Grandmother's petition for de facto parent status relative to the minor. On March 16, 2012, the Department filed an amended section 387 petition in which it again sought the minor's removal from Grandmother's care.

In a supplemental report pursuant to section 366.26 submitted on April 3, 2012, the Department recommended that the parental rights of Mother and Father be terminated and that the permanent plan of long-term foster care be ordered for the minor. It filed an addendum report on April 17, 2012, advising that it was seeking to withdraw its section 387 petition; it was no longer seeking the removal of the minor from Grandmother's care, but it had concerns about the minor's placement with her on a long-term basis. The Department concluded that there were no currently identified prospective adoptive parents for the minor. It indicated further that it was seeking an order in which the court would find the minor adoptable, and that there was a probability he would be adopted but would be difficult to place. It requested further that the court identify adoption as the permanent placement goal for the minor, and that the Department be permitted a period of 180 days to attempt to locate adoptive placement. The Department indicated further that during the 180-day period, it would like Grandmother to participate in services to determine whether the minor's placement with her could support his long-term needs for stability and permanency.

A four-day contested permanency hearing took place on May 23, June 11, June 13, and June 25, 2012. The court received documentary evidence and testimony from several witnesses, including Mother and Grandmother. The court found by clear and convincing evidence that the minor was both generally and specifically adoptable. It also concluded that the minor was living with a relative (Grandmother) unable or unwilling to adopt him,

11

but Grandmother was capable of providing the minor with a stable and permanent environment.  It therefore found the permanent plan of legal guardianship to be appropriate.  The court ordered that Mother receive supervised visitation of the minor twice per month, with discretion vested in the social worker to permit additional visitation for special occasions.  It set a post-permanency planning review hearing for January 31, 2013.  Neither Mother nor Father appealed this order.  Grandmother was appointed the minor's legal guardian on July 10, 2012.

IX.    *Report and Second .26 Hearing (June 2013)*

In a report filed January 31, 2013, the Department recommended that the minor remain a dependent and that a .26 hearing be set to change the permanent plan to adoption.  It noted that Grandmother had made progress in setting boundaries with Mother in structuring her visitation with the minor.  Grandmother had stated that she now wanted to adopt the minor.  The court set a .26 hearing for May 30, 2013.  Neither Mother nor Father sought appellate review of this order.  The Department thereafter filed a report pursuant to section 366.26 in which it recommended that the court find the minor adoptable and order the termination of parental rights of Mother and Father.

The second .26 permanency hearing occurred on June 17, 2013.[8]  After hearing testimony from, among other witnesses, Mother and Grandmother, and after hearing argument, the court adopted the recommendations of the Department.  It found the minor to be generally and specifically adoptable; rejected Mother's claim that the beneficial parental relationship exception applied; selected a permanent plan of adoption for the minor; and terminated the parental rights of Mother and Father.

---

[8] The hearing on the second .26 petition, including the testimony and documentary evidence considered by the court, is discussed in detail, *post*.

Mother filed a timely notice of appeal.  That order is one from which an appeal lies.  (§ 366.26, subd. (i)(1); see *In re Matthew C.* (1993) 6 Cal.4th 386, 393, superseded by statute on another point as stated in *People v. Mena* (2012) 54 Cal.4th 146, 156.)

DISCUSSION

I.    *Applicable Legal Principles*

Section 300 et seq. provides "a comprehensive statutory scheme establishing procedures for the juvenile court to follow when and after a child is removed from the home for the child's welfare.  [Citations.]"  (*In re Celine R.* (2003) 31 Cal.4th 45, 52.)  As our high court has explained, "The objective of the dependency scheme is to protect abused or neglected children and those at substantial risk thereof and to provide permanent, stable homes if those children cannot be returned home within a prescribed period of time.  [Citations.]  Although a parent's interest in the care, custody and companionship of a child is a liberty interest that may not be interfered with in the absence of a compelling state interest, the welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect.  [Citations.]  The Legislature has declared that California has an interest in providing stable, permanent homes for children who have been removed from parental custody and for whom reunification efforts with their parents have been unsuccessful.  [Citations.]  This interest is a compelling one. [Citation.]"  (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307.)

After it has been adjudicated that a child is a dependent of the juvenile court, the exclusive procedure for establishing the permanent plan for the child is the permanency hearing as provided under section 366.26.  The essential purpose of the hearing is for the court "to provide stable, permanent homes for these children."  (§ 366.26, subd. (b); see *In re Jose V.* (1996) 50 Cal.App.4th 1792, 1797.)  There are six statutory choices for the permanency plan; the preferred choice is that the child be ordered to be placed for adoption, coupled with an order terminating parental rights.  (§ 366.26, subd. (b); see also *In re Celine R.*, *supra*, 31 Cal.4th at p. 53 ["Legislature has thus determined that, where

possible, adoption is the first choice"]; *ibid.* [where child is adoptable, "adoption is the norm"].)[9] The court selects this option if it "determines . . . by a clear and convincing standard, that it is likely the child will be adopted." (§ 366.26, subd. (c)(1).)

Thus, at the permanency planning hearing, "in order to terminate parental rights, the court need only make two findings: (1) that there is clear and convincing evidence that the minor will be adopted; and (2) that there has been a previous determination that reunification services shall be terminated. '[T]he critical decision regarding parental rights will be made at the dispositional or review hearing, that is, that the minor cannot be returned home and that reunification efforts should not be pursued. In such cases, the decision to terminate parental rights will be relatively automatic if the minor is going to be adopted.' [Citation.] '[T]he decisions made at the review hearing regarding reunification are not subject to relitigation at the termination hearing. This hearing determines only the type of permanent home.' [Citation.]" (*In re Cynthia D.* (1993) 5 Cal.4th 242, 249-250, quoting Sen. Select Com. on Children & Youth, SB 1195 Task

---

[9] "(b) At the hearing, which shall be held in juvenile court for all children who are dependents of the juvenile court, the court, in order to provide stable, permanent homes for these children, shall review the report as specified in Section 361.5, 366.21, 366.22, or 366.25, shall indicate that the court has read and considered it, shall receive other evidence that the parties may present, and then shall make findings and orders in the following order of preference: [¶] (1) Terminate the rights of the parent or parents and order that the child be placed for adoption and, upon the filing of a petition for adoption in the juvenile court, order that a hearing be set. The court shall proceed with the adoption after the appellate rights of the natural parents have been exhausted. [¶] . . . [¶] (3) Appoint a relative or relatives with whom the child is currently residing as legal guardian or guardians for the child, and order that letters of guardianship issue. [¶] . . . [¶] (5) Appoint a nonrelative legal guardian for the child and order that letters of guardianship issue. [¶] (6) Order that the child be placed in long-term foster care, subject to the periodic review of the juvenile court under Section 366.3. . . ." (§ 366.26, subd. (b).)

Force Rep. on Child Abuse Reporting Laws, Juvenile Court Dependency Statutes, and Child Welfare Services (Jan. 1988).)[10]

"If the court determines it is likely the child will be adopted, certain prior findings by the juvenile court (e.g., that returning the child to the physical custody of the parent would create a substantial risk of detriment to the physical or emotional well-being of the child) shall constitute a sufficient basis for the termination of parental rights unless the juvenile court finds one of six specified circumstances in which termination would be detrimental [to the child]." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1522-1523, citing § 366.26, subd. (c)(1).) The six specified circumstances in section 366.26, subdivision (c)((1)(B) may serve as compelling reasons for the court's electing not to terminate parental rights if it finds that such "termination would be detrimental to the child." These circumstances are "actually *exceptions* to the general rule that the court must choose adoption where possible." (*In re Celine R.*, *supra*, 31 Cal.4th at p. 53, original italics.) They " 'must be considered in view of the legislative preference for adoption where reunification efforts have failed.' [Citation.] At this stage of the dependency proceedings, 'it becomes inimical to the interests of the minor to heavily burden efforts to place the child in a permanent alternative home.' [Citation.] The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*Ibid.*, original italics.) One such exception—urged by Mother here—based upon the beneficial parental relationship, requires a showing that "[t]he parents have maintained regular visitation and contact with

---

[10] "After the termination of reunification services, a parent's interest in the care, custody and companionship of the child is no longer paramount. [Citation.] Rather, at this point, the focus shifts to the needs of the child for permanency and stability. [Citation.]" (*In re Angel B.* (2002) 97 Cal.App.4th 454, 464.)

15

the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

    II.    *Court's Rejection of Beneficial Parental Relationship Exception*

        A.    *Applicable Law*

Under the beneficial parental relationship exception, the parent must establish that he or she has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)[11]  This requires a two-prong showing by the parent that (1) he or she has maintained regular visitation, and (2) the child would benefit from continuing the relationship. (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643.)  " 'Sporadic visitation is insufficient to satisfy the first prong' of the exception." (*Ibid.*, quoting *In re C.F.* (2011) 193 Cal.App.4th 549, 554.)  In order to establish the second prong, the parent must show "that 'severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed.  [Citations.] A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent.' [Citation.]" (*In re Marcelo B.*, at p. 643, original italics, quoting *In re Angel B.*, *supra*, 97 Cal.App.4th at p. 466.)  The burden is on the parent asserting the beneficial parent relationship to produce evidence establishing that exception. (*In re I.W.*, *supra*, 180 Cal.App.4th at

---

[11] "[T]he court shall terminate parental rights unless either of the following applies:  [¶] . . . [¶] (B) The court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances:  [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1).)

16

p. 1527.)  That burden of establishing the exception is a "heavy" one.  (*In re C.F.*, at p. 558.)

In determining whether the beneficial parental relationship exception applies, the court balances the degree of benefit that a continuation of the parental relationship would afford versus the benefit of placing the child with adoptive parents.  (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50.)  As one court has explained:  "[W]e interpret the 'benefit from continuing the [parent/child] relationship' exception to mean the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.  In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated."  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

Application of the beneficial relationship exception is a case-specific endeavor.  (*In re Autumn H.*, *supra*, 27 Cal.App.4th at pp. 575-576.)  " 'Interaction between natural parent and child will always confer some incidental benefit to the child.  The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation.  [Citation.]  The relationship arises from day-to-day interaction, companionship and shared experiences.  [Citation.]  The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent.' [Citation.]"  (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1315-1316.)

And the inquiry does not end when the parent has established the existence of the beneficial parental relationship under the two-part test described above.  It must be shown further that this beneficial parental relationship provides a "compelling reason for

17

determining that termination [of parental rights] would be detrimental to the child."
(§ 366.26, subd. (c)(1)(B); see *In re Marcelo B.*, *supra*, 209 Cal.App.4th at p. 642.)

Review of a court's determination of the applicability of the parental relationship exception under section 366.26 is governed by a hybrid substantial evidence/abuse of discretion standard. (*In re Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1314-1315.) "Since the proponent of the exception bears the burden of producing evidence of the existence of a beneficial parental . . . relationship, which is a factual issue, the substantial evidence standard of review is the appropriate one to apply to this component of the juvenile court's determination. Thus, . . . a challenge to a juvenile court's finding that there is no beneficial relationship amounts to a contention that the 'undisputed facts lead to only one conclusion.' [Citation.] Unless the undisputed facts established the existence of a beneficial parental . . . relationship, a substantial evidence challenge to this component of the juvenile court's determination cannot succeed. [¶] The same is not true as to the other component of . . . the parental relationship exception . . . [, which] is the requirement that the juvenile court find that the existence of that relationship constitutes a '*compelling reason* for determining that termination would be detrimental.' (§ 366.26, subd. (c)(1)(B), italics added.) A juvenile court finding that the relationship is a 'compelling reason' for finding detriment to the child is *based* on the facts but is not primarily a factual issue. It is, instead, a 'quintessentially' discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption. [Citation.] Because this component of the juvenile court's decision is discretionary, the abuse of discretion standard of review applies." (*Ibid.*, original italics; see also *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622 [following *In re Bailey J.*].)

18

B.    *Background Concerning Parental Relationship Exception*

The court at the permanency hearing held on June 17, 2013, considered the Department's section 366.26 assessment filed May 30, 2013, the report and recommendation of the Court Appointed Special Advocate (CASA) filed May 30, 2013, and a letter written by Grandmother. It took judicial notice of its findings and orders from the first .26 hearing that had concluded on June 25, 2012. It also heard testimony from Mother, Grandmother, and social worker Paige Baldhosky.

The court also received a statement made at the hearing by Grandmother in which she indicated that she had vacillated between the desire to continue to be the minor's legal guardian and the position that she wanted to adopt him. She stated that she had been concerned that if she chose adoption, it might impact Mother's ability to keep her unborn child, but she was assured that "she'll be able to keep her baby if she keeps doing what she's doing." Grandmother advised the court that she wanted to continue to care for the minor, keep him safe, and ultimately do what was best for him.

1.    *Reports*

On May 30, 2013, the Department filed a report pursuant to section 366.26. It summarized the lengthy history of the dependency proceedings, concluding that Mother and Father had been unable to meet the minor's daily needs for food, shelter, stability and safety. The minor was attending first grade and required specialized and modified small group instructions. He was exhibiting improvement in interactions with peers and in showing more impulse control. He had also been recently diagnosed by a specialist as having symptoms consistent with Tourette syndrome. The Department noted that since February 2013, Mother had been visiting the minor under the supervision of Grandmother four times per week. "According to [G]randmother, these visits are working out well and [G]randmother is active in the parent role during the visits. [The minor] enjoys spending time with his [M]other and has a hard time after visits. [G]randmother is supportive during this time and is maintaining emotional boundaries

19

with [Mother] to be protective of [the minor]. The [G]randmother continues to receive weekly therapeutic support . . . [and she] continues to benefit from . . . [that] support and is actively applying and using tools for establishing and maintaining emotional boundaries with her daughter. It appears that [G]randmother has a solid understanding of [the minor's] needs and what her role is in keeping him emotionally safe during/after visits with his [M]other. The [social worker] observed a visit on May 7, 2013 . . . [The minor] enjoyed playing board games and Legos with his [M]other. [Mother] engaged [the minor] in an affectionate, loving and playful manner. [The minor] responded positively to [Mother]. They appear to have a positive visiting relationship."

In its report, the Department observed that mother's visitation history with the minor had been positive, but that Grandmother was the one who had filled the parental role for the minor: "[Mother] has developed a positive visiting relationship with [the minor], where she engages with him in a playful, affectionate and loving manner. Yet, it is [the minor's] maternal Grandmother, [T.H.], who has taken on the parental role with [the minor], providing for his daily needs, as well as his special needs. [Grandmother] has demonstrated her commitment to [the minor] and has shown that she is able to meet all of his needs, while providing emotional support, structure, nurturing and the permanency he deserves. [The minor] would not benefit from the possibility of a parent/child relationship with [Mother] and [Father]. His need for permanency, emotional stability, consistency, security, and sense of belonging that his caregiver provides greatly outweighs any possible parent/child relationship with [Mother] and [Father]." The Department recommended that the minor be placed for adoption and that the parental rights of Mother and Father be terminated.

A report was also filed on May 30, 2013, in connection with the .26 hearing, by the CASA representative, Katie Hund. Hund reported that the minor was "a fun 6-year-

old boy with special needs typical of prenatal drug exposure. He has learning disabilities but is a very smart and observant child."[12] Hund also indicated that the minor was comfortable living in Grandmother's home. Other cousins often lived with Grandmother, and the minor appeared to have good relationships with them as well.

CASA representative Hund summarized in her assessment: "Overall, [the minor] seems to be doing well in his current situation. He is a kid with special needs [who] is growing and learning. I have been impressed with his improvement and interaction with me and genuinely love being around him. . . . [¶] My hope for [the minor] is that he would be adopted to provide a level of permanency that he needs—whether by [Grandmother] or by another family if [Grandmother] is not deemed to be an appropriate adoptive parent. [Grandmother] loves him very much and is providing for his needs. [The minor] has a long history of being in [Grandmother's] care and I believe that their relationship should continue whether he is living with her or not. He loves his [M]other and wants to be with her, but due to his [M]other's long history of domestic violence, substance abuse and criminal involvement[,] that is not possible today. [¶] I am concerned that the current visitation routine may be confusing to [the minor] (i.e. mom coming over to put him to bed at night, visits not consistent or structured), that there are behavioral repercussions to those interactions, and that the roles between [G]randmother and [M]other are sometimes unclear. As he grows he will need more and more attention and boundaries and my hope is that he is in a permanent home (without fear of moving)

_____

[12] There were suspicions voiced by multiple professionals that Mother had taken drugs and/or had drunk alcohol while she was pregnant with the minor. For instance, in a developmental assessment of the minor performed by Lesley Wilson, Ph.D., a clinical psychologist, it was indicated that the minor may have been exposed to alcohol and drugs in utero, and he exhibited "severe facial dysmorphology that is consistent with Fetal Alcohol Syndrome." There is no definitive evidence in the record that the minor was in fact exposed to drugs or alcohol in utero, and Mother denied having taken drugs or alcohol while she was pregnant with the minor.

that can provide for those growing needs. [Grandmother] today appears to be most capable [of] taking care of him. I would like to make sure that his [Grandmother] has the continued support she needs to provide structure and boundaries for [the minor's] visits with [Mother] and to continue to provide for [the minor's] emotional wellbeing as he grows into adolescence."

At Mother's request, a letter dated June 14, 2013, written by Grandmother was introduced into evidence. She indicated that Mother had had weekly four-hour visits with the minor that were supervised by Grandmother. The minor was always happy to see Mother and "greet[ed] her with a hug and a smiling greeting of, 'Mommy!'" Mother would always bring the minor one of his favorite snacks and a toy. During the visits, Mother was "attentive and sensitive to [the minor's] needs as shown through prompt, consistent, and tender responses." Grandmother reported that "the minor becomes distraught when the visits are over; crying, hiding in another room or begging his [M]other to return the next day or to follow us to his house in her car if we are on an outing. He settles down once I hold him and validate his feelings."

### 2. *Testimony*

Grandmother was called as a witness by Mother's counsel. Grandmother testified that, although she had previously indicated that she wanted to be the minor's legal guardian, she now wished to adopt him. She explained that her change of position was due to her "fear of him being taken away. I was told if I just kept legal guardianship that it would be easier for [the minor] to be taken away from me than if I adopted him."

On cross-examination by the Department's counsel, Grandmother testified that she felt the minor was doing well under her care, "doing well with his medication and the boundaries that I've set with him. [¶] He's learning to get along with other children. With the [Tourette] Syndrome, that's something new . . . There'll always be something that we'll work on, but he's doing well. Happy." Grandmother also testified—as evidence of how well the minor was doing—that he was currently attending a vacation

22

Bible camp with other children who were not special needs children. She testified that she was willing to continue as the minor's legal guardian or to adopt the minor, whichever the court concluded was in the minor's best interest.

Mother testified that she had been clean and sober for almost 13 months. She was at the time of trial attending the Primeros Pasos substance abuse program for pregnant and parenting mothers. Mother testified that she had had no positive drug tests in the past three months.

Mother testified further that she had visited the minor four hours a week, generally on Sundays, and had a "Mother and son" relationship with him. "[He] knows I'm his mom, sees me, he runs up to me and jumps in my arms and says ['M]ommy.[']" She generally brought food and a toy to play with. Sometimes they went to the beach or the Boardwalk; Mother played with the minor and let him decide what he wanted to do or show her. Mother testified that since she was last in court,[13] she had not had any unauthorized visits with the minor, and Grandmother's boundaries regarding visitation had been very clear. She was in touch with the minor by telephone during the week; he called Mother when he was going to bed or after he had had an argument with his cousin.

Mother felt that it would be in the minor's bests interests for her not to have her parental rights "terminated because it would be in his best interest for me to be involved in his life and . . . be a part of his life whatever that may look like as far as [Grandmother] being the primary caregiver primary parent." Mother stated that if legal guardianship was

---

[13] This testimony is ambiguous. The hearing Mother attended immediately before the .26 hearing on June 17, 2013, was only about two weeks earlier, on May 30, 2013; in the prior hearing, the court continued the case for a contested .26 hearing on June 17, 2013. It is possible that Mother meant that she had made no unauthorized visits since the last hearing in which any substantive action was taken, i.e., the post-permanency hearing on January 31, 2013, in which the court adopted the Department's recommendations and set a new .26 hearing to entertain a permanent plan of adoption for the minor.

ordered, she would continue to comply with the requirements and limits of her visitation order.

The Department called social worker Paige Baldhosky in rebuttal. Baldhosky was assigned as the case worker in March 2013. Her recommendation that adoption was preferred over legal guardianship was based upon her views that the minor (1) was adoptable despite his special needs; and (2) needed to have one or two people who were his parents who would give him stability and who were committed to provide for his needs throughout his maturation. Baldhosky also testified that the minor "needs a forever family, a family where he will be safe and [one] without the concern of coming back into the system."

### 3. *Counsel's Argument*

Counsel for the Department noted that it had initially pursued the termination of parental rights in a contested hearing a year earlier, but the Department had ultimately withdrawn its request, along with the request for removal of the minor from Grandmother's care with the understanding that Grandmother would continue as legal guardian and would receive services to assist her in parenting. Because Grandmother had made progress after receiving services and the minor had made progress as well, the Department was comfortable with recommending adoption as the permanent plan, and therefore requested the setting of a new .26 hearing.

The Department emphasized that the minor was doing well in Grandmother's care, as evidenced in part by the fact that he was attending camp with children who did not have special needs. It also highlighted that Grandmother had stepped into the role of parent; had acknowledged the power of the substance abuse disease that Mother was dealing with; had made a clear commitment to caring for the minor; and had indicated a willingness to maintain legal guardianship or to adopt the minor, whichever path was in the minor's best interest. These factors, combined with the time the minor had spent in the system, his special needs, his need for permanency, and Mother's lengthy struggle

24

with substance abuse, militated toward a finding of adoption as the permanent plan for the minor.

The minor's counsel argued that Grandmother had been the primary parent for the minor for several years and had been "the person [who has] 24/7 been providing for [the minor's] needs and special needs and struggling with him on a daily basis." He therefore concurred with the Department's recommendation.

Mother's counsel argued that the beneficial parental relationship applied and therefore the court should reject the Department's recommendation of adoption as the permanent plan.[14] She emphasized the positive nature of Mother's relationship and visitation with the minor. Mother "is proactive and is engaging [the minor]. . . . [During] visitation she's appropriate and attentive to him. And [the minor] responds to her. And . . . she is in contact with him during the week and [the minor] looks to his Mother for comfort. He calls her when he is upset, calls when he has [an] argument with his cousin."

Grandmother (unrepresented at the hearing) argued that she wanted the opportunity to raise the minor, reiterating that "whatever format is best for him will work for me." She believed that she "offer[ed] him the structure and the stability, and [would] protect him from any trauma or drama that I know drug addiction can bring."

---

[14] Mother's counsel also argued that the exception under subdivision (c)(1)(B)(iv) of section 366.26 applied because the minor was living with a foster parent unwilling or unable to adopt him because of exceptional circumstances not involving an unwillingness to accept financial or legal responsibility for the child. The court rejected this position. Mother does not assert on appeal that the court erred in rejecting this statutory exception.

### 4.    *Court's Decision*

The court noted at the outset in its ruling that it had previously found the minor to be adoptable and there was no evidence presented to disturb that prior ruling. It therefore found the minor to be generally and specifically adoptable.[15]

The court then observed that it had been presiding over the case since April 2009 and had "seen the ups and downs" over that period of time with "many contested hearings with detailed testimony, and changing of circumstances." It reviewed the history of the proceedings, noting that at the initial dispositional and jurisdictional hearing, it had left the minor in Mother's care under a family maintenance program despite her substance abuse and other issues. The minor was removed from Mother's care in October 2010; the court placed the minor with Grandmother, and provided family reunification to the parents. The court observed, "[W]e have gone through extensive efforts, services and expense to try to battle [Mother's] addiction . . . [Grandmother] has not been alone in hoping and trying to figure out ways to help [Mother]. The Department and the Court have for four years tried to assist Mother and offered her services above and beyond what many families are offered."

The court noted that "unfortunately," there had been a section 387 petition seeking the minor's removal from Grandmother's care; the petition resulted in there being a contested hearing and an order to maintain the placement with Grandmother with a case plan. It observed that Grandmother "rose to the occasion. I saw a [G]randmother step forward and say, you know, I still want my daughter to be a mother, but this child needs me and I'm going to do what it takes. . . . I saw . . . [Grandmother] start getting her priorities right, and her priorities ended up putting [the minor] first, and I've seen a dramatic change, not only in [Grandmother] and how she presents now as a protective

---

[15] Mother does not challenge the adoptability finding on appeal.

parent that [the minor] has and needs, but also I see a child who is able to have tools to maintain himself in his peer relationships, his school relationships, even in his relationships with his [G]randmother in a totally different, calmer way.  [¶] So, yes, he does have challenges, however, those challenges aren't as big as they were a year ago. He is developing, he is growing, but it has been [G]randmother who has fought hard to be able to put those interventions in place.  And she is working with a team of people [who] are surrounding her and [the minor] with options, and those options are actually working. [¶] So that team has ended up bringing this child to being able to participate in baseball. I'm telling you, a year ago there's no way I would have thought that there was any hope of him being able to be socialized in a positive . . . [and] nonviolent way that he could interact with children on a baseball team and be part of the team.  He goes to horse lessons.  He is able to interact in such different ways[—]that's just wonderful."

The court concluded that the minor is "on his way.  He's on his way because of [Grandmother].  And he's on his way because [Grandmother] got the wake-up call. When [Grandmother] realized [the minor would] be taken from [her] care, she had to put her priorities in order.  And she put him first and started figuring out ways to put up barriers that emotionally have been very difficult to put up . . . between herself and her daughter. . . . It is difficult.  We're asking . . . her at times to do the impossible.  But she has come today and been very clear that [the minor] is the first priority.  And [the minor] is the first priority for the Court."

With respect to Mother, the court found she "has not, over the history of this case, and still has not been able to be the parental stability that [the minor] needs."  The court further indicated that it was "not seeing that Mother is holding the parental place in [the minor's] life."  The fact that the minor might look to Mother if he was upset, such as when he had a fight with his cousin who was living with him, did not suggest otherwise to the court; rather, it concluded that in such instances the minor was "looking for outside opinion.  Grandmother is trying to raise both boys . . . and no doubt [the minor is] looking

27

for support for his position." The court observed that Mother had "not lived a stable life herself" for the past year, in that she had gone through a surrogacy in which the minor was ultimately upset that Mother had given up the child pursuant to her agreement; had married someone with a criminal record; and was pregnant.

The court therefore rejected Mother's assertion of the beneficial parental relationship exception, and based upon the finding of adoptability, terminated Mother's and Father's parental rights. It set a six-month hearing to review the permanency plan of December 5, 2012.

C. *No Error in Rejection of Beneficial Parental Relationship Exception*

Mother argues that the court erred in terminating her parental rights, which was a consequence of its finding inapplicable the beneficial parental relationship exception under section 366.26, subdivision (c)(1)(B)(i). She asserts that she met her dual burden of establishing (1) her regular visitation of the minor, and (2) there was a significant and positive emotional attachment between the minor and Mother. She contends that the evidence supported the first prong of regular visitation and contact with the minor. Mother argues further that there was no substantial evidence to support the court's conclusion that she and the minor did not have an enduring bond. Stated conversely, she asserts that she established the second prong of a significant and positive emotional parent-child attachment. Mother summarizes: "[Mother's] engagement in [the minor's] life extended beyond the time that they were physically together. She demonstrated a commitment to ensure that [the minor's] needs were met, both before the dependency case started and after. She acted as [the minor's] mother." Mother contends further that the court erred in the manner in which it balanced the benefit of adoption versus maintaining the bond between Mother and the minor.

We first consider whether Mother demonstrated the existence of a beneficial parental relationship by the two-prong showing of (1) regular visitation and (2) that the child would benefit from continuing the relationship. (*In re Marcelo B.*, *supra*, 209

28

Cal.App.4th at p. 643.) The court made no specific finding one way or the other concerning whether there had been regular visitation and contact by Mother with the minor. We, however, credit the evidence in the record supporting this conclusion. Stated otherwise, had the court specifically found to the contrary—which specific finding does not exist in the record here—it would not be supported by substantial evidence.

Proof of the existence of the second prong, however, is more problematic. Although not explicitly stated, the court's comments—including its statement that it was "not seeing that Mother is holding the parental place in [the minor's] life"—may be reasonably construed as implicitly rejecting Mother's claim that the minor would benefit from continuing the parental relationship. Mother, as the proponent of the exception, had the burden of producing evidence showing its existence. (*In re Bailey J.*, *supra*, 189 Cal.App.4th at p. 1314.) The court's conclusion (whether express or implied) that Mother did not satisfy the second prong of the exception "turns on a failure of proof at trial, [such that] the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.]" (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1528.)

As noted, to establish the second prong of the beneficial parental relationship exception, the parent must show "that 'severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed." (*In re Marcelo B.*, *supra*, 209 Cal.App.4th at p. 643, original italics, quoting *In re Angel B.*, *supra*, 97 Cal.App.4th at p. 466.) Therefore, the mere fact that there may be *some* benefit in the parent-child relationship existing between Mother and the minor is insufficient to satisfy this prong. In determining whether the relationship between parent and child is beneficial, we look to such factors as "(1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs. [Citation.]" (*In re Angel B.*, at p. 467, fn. omitted.)

29

The age of the minor favored his adoptability. (See *In re Gregory A.* (2005) 126 Cal.App.4th 1544.) He is still quite young, being nearly seven at the time of the challenged order; dependency proceedings were initiated when he was only two.

The evidence was that the minor had spent the first four years and two months of his life in Mother's custody. From the time of Mother's arrest in August 2010 to the time of the hearing—two years and ten months—the minor was in Grandmother's custody. While the minor therefore spent the majority of his life in Mother's custody, it would be simplistic and incorrect to conclude that this fact offers strong support for finding a beneficial relationship. The record is clear that for at least a portion of the minor's life before August 2010, he was residing with Mother *and Grandmother*. It is apparent that Grandmother has had significant contact with and influence over the minor for his entire life, both before and after gaining custody of him. And it is noteworthy that Grandmother has had custody of the minor during the critical years of his life that included commencement of school (kindergarten and first grade), and has seen him through some very difficult times of adjustment and alterations of his behavior.

In assessing "the positive or negative effect of interaction between the parent and the child" (*In re Angel B.*, *supra*, 97 Cal.App.4th at p. 467), the conclusion here is equivocal. There was certainly evidence presented of a positive relationship between Mother and the minor as evidenced during Mother's supervised visits. The social worker, for instance, observed that the minor enjoyed playing games with Mother, responded positively to her, and "[Mother] engaged [the minor] in an affectionate, loving and playful manner." CASA representative Hund indicated her impression that the minor "loves his [M]other and wants to be with her." Grandmother, through her letter, indicated that Mother's interactions with the minor during visits were positive, and that Mother was "attentive and sensitive to [the minor's] needs." And Mother testified to her positive relationship with the minor, including the enthusiasm with which he greeted her and the fun they had during their visits.

On the other hand, the visits were difficult for the minor, as evidenced by the case worker's and Grandmother's comments that the minor was upset at the conclusion of the visits, and that Grandmother would have to work with him after the visits to calm him down and "validate his feelings." Furthermore, CASA representative Hund opined that Mother's visits might "be confusing to [the minor]" in that they were "not consistent or structured" and conceivably caused the "roles between [G]randmother and [M]other [to become] unclear." Thus, even if Mother and the minor may have had "a loving and happy relationship" (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1419), or "frequent and loving contact or pleasant visits" (*In re C.F.*, *supra*, 193 Cal.App.4th at p. 555), these factors would not satisfy Mother's burden of showing the existence of a beneficial parental relationship.

Lastly, assessment of "the child's particular needs" (*In re Angel B.*, *supra*, 97 Cal.App.4th at p. 467) favors adoptability, rather than application of the exception argued by Mother. Those needs—especially given the minor's physical, emotional and developmental challenges—included a need for stability that was satisfied through his relationship with Grandmother. She was praised by social worker Baldhosky, CASA representative Hund, and the court for her efforts in helping the minor make dramatic improvements in behavioral skills and interactions with his peers in the year prior to the second .26 hearing. Baldhosky emphasized that Grandmother had filled the parental role for the minor, and had been responsible for meeting all of his needs, including his special needs. And Baldhosky and Hund noted specifically that the minor had a need for permanency and stability that adoption, preferably by Grandmother, would provide him.

Mother contends on appeal that the court improperly "require[d] her to prove that she is 'stable' in order to retain her [parental] rights." But it was entirely appropriate for the court, in concluding that the minor needed permanency and stability that adoption could provide him, to consider Mother's history of a lack of stability, including her numerous drug relapses. In so looking at "the child's particular needs" (*In re Angel B.*, at

31

p. 467) as a factor in determining whether the second prong of the exception was satisfied, the court properly considered stability in assessing whether the relationship between parent and child was beneficial.**16**

In short, there was a failure of proof by Mother that the minor would benefit from continuing his relationship with Mother. As noted, "a challenge to a juvenile court's finding that there is no beneficial relationship amounts to a contention that the 'undisputed facts lead to only one conclusion.' [Citation.] Unless the undisputed facts established the existence of a beneficial parental . . . relationship, a substantial evidence challenge to this component of the juvenile court's determination cannot succeed." (*In re Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1314-1315.) Mother's challenge cannot succeed here because the undisputed facts did not *establish* the existence of a beneficial parental relationship. (See *In re I.W.*, *supra*, 180 Cal.App.4th at p. 1528 ["the evidence [does not] compel[] a finding in favor of the appellant as a matter of law"].)**17**

But even if we were to conclude (which we do not), based upon our review of the record for substantial evidence, that Mother established as a matter of law the existence of a beneficial parental relationship, her appellate claim nonetheless fails. Mother was also required to show that the purported existence of the beneficial parental relationship

---

**16** The court's assessment of the minor's need for stability and its comparison of the degree of stability provided by residing with Grandmother versus residing with Mother was also relevant in the court's discretionary determination of whether the beneficial parental relationship (assuming its existence) presented "a compelling reason for determining that termination would be detrimental to the child." (§ 366.26, subd. (c)(1)(B); see *In re Bailey J.*, *supra*, 189 Cal.App.4th at p. 1315.)

**17** Mother challenges the propriety of the trial court's consideration of her decisions to enter into a surrogacy agreement, to later remarry a person with a criminal record, and to become pregnant. The court's recital of these matters is not relevant to our review of whether it erred in rejecting Mother's claim of the beneficial parental relationship exception. "The juvenile court's reasoning is not a matter for our review. [Citation.]" (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1313.)

presented "a compelling reason for determining that termination would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).)[18] This is "a 'quintessentially' discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption. [Citation.]" (*In re Bailey J.*, *supra*, 189 Cal.App.4th at p. 1315, original italics.)

There was no abuse of discretion. The undisputed evidence that the minor was adoptable, was currently living in a stable home with a prospective adoptive parent, Grandmother, and had made significant strides in the year prior to the second .26 hearing under Grandmother's care, was balanced against his relationship with Mother. This evidence included Mother's history of drug, crime, and domestic violence issues, and her repeated relapses both before and after the initiation of these dependency proceedings, notwithstanding her participation in numerous treatment programs. As the court noted, "we have gone through extensive efforts, services and expense to try to battle [Mother's] addiction . . . . The Department and the Court have for four years tried to assist Mother and offered her services above and beyond what many families are offered." The social worker from the Department characterized Mother's relationship with the minor as "a positive visiting relationship," as opposed to a close mother-child relationship. Moreover, Mother offered no bonding study or other evidence showing that termination of parental rights would have a significant (or even any) actual detriment on the minor's life. (See *In re C.F.*, *supra*, 193 Cal.App.4th at p. 557.)[19]

---

[18] The court specifically observed that adoption would be designated as the permanent plan unless it found "a compelling reason for determining that termination [of parental rights] would be detrimental to the child due to [the beneficial parental relationship] exception[]."

[19] At the contested twelve-month review hearing held November 28, 2011, the court ordered that a bonding study involving Mother and the minor be conducted by a professional. Six months later—on May 23, 2012, during the first day of the four-day

*(continued)*

The court implicitly found that continuation of the parental relationship between Mother and the minor did not present a compelling reason for determining that its termination would be detrimental to him. (See *In re Jesse B.* (1992) 8 Cal.App.4th 845, 851 [juvenile court need not make specific reference to detriment or make findings concerning detriment of termination of parental rights upon child, unless it "is persuaded to forego termination"]; see also *In re A.A.*, *supra*, 167 Cal.App.4th at p. 1321.) Therefore, its conclusion that "severing the natural parent/child relationship would [not] deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed" (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575) was not one that " 'exceeded the bounds of reason.' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)

We find no error in the court's rejection of the beneficial parental relationship exception in this case. There was substantial evidence supporting the trial court's conclusion that Mother failed to establish the existence of the beneficial parental relationship between her and the minor, and it did not abuse its discretion by finding that any purported existence of such a relationship did not present a compelling reason to apply this statutory exception in lieu of adoption. This is not a case involving "*exceptional circumstances* [citation] [in which the court is permitted] to choose an option other than the norm, which remains adoption." (*In re Celine R.*, *supra*, 31 Cal.4th at p. 53.)

---

initial permanency hearing that resulted in the court finding legal guardianship to be the appropriate permanent plan for the minor—Department's counsel advised the court that the bonding study had not been performed, due to budgetary constraints as well as the court's prior indication (according to counsel) that it was unlikely to find a bonding study to constitute evidence that was "very persuasive." Neither Mother nor Father—who were both represented by counsel at the hearing—objected to the failure to complete the bonding study. And there is nothing in the record to indicate that either party took any action thereafter—in the one-year period between the May 2012 permanency hearing and the June 2013 second permanency hearing—to ensure that a bonding study was performed.

## DISPOSITION

The June 17, 2013 order approving adoption as the permanent plan for J.J. and terminating the parental rights of Mother and Father is affirmed.

_____
Márquez, J.

WE CONCUR:

_____
Rushing, P. J.

_____
Premo, J.